*186 OPINION OF THE COURT
Robert C. Meade, J.
This case presents an unusually complicated legal problem without precedent in the law of this State — whether a committee of the person should be appointed for an individual who was recently of sound mind but who has allegedly become incompetent as a result of severe physical maladies and whether that committee should be authorized to cause the withdrawal from the incompetent of life supporting systems characterized as extraordinary. The relief requested of this court will, according to the medical testimony, have the most far-reaching and final effect upon the incompetent; it will, in all likelihood, result in his death within a short period of time. In addition, the relief, unless strictly defined and limited, could conceivably have serious and profound consequences for the future welfare of all of the citizens of this State. Accordingly, an extended discussion is necessary both to describe the basis for a conclusion and to establish clearly the demarcations beyond which this decision cannot be said to go.
THE FACTS
I
THE PETITION
This matter came before the court by way of a verified petition dated October 22, 1979 and subscribed by petitioner, Father Philip K. Eichner, a priest of the Roman Catholic Church, President of Chaminade High School and Director of the Society of Mary at Chaminade, a religious community within the Roman Catholic Church which is devoted to social welfare and the education of youth. The petition and supporting papers set forth the following facts.
On September 25, 1979, Brother Joseph Charles Fox, 83 years old but in good health, entered Nassau Hospital to undergo certain medical tests. On October 1, 1979, Brother Fox re-entered the hospital and, at about 10:00 a.m. on the following day, underwent hernia surgery. Brother Fox never regained consciousness after the surgery.
Accompanying the petition were affidavits from three physicians, including two neurosurgeons, describing the medical condition of Brother Fox. Dr. Edward Kelly, a surgeon and Brother Fox’s treating physician, stated that, during the sur *187 gery on October 2, at about 11:10 a.m., Brother Fox suffered a severe cardiorespiratory arrest. Despite extensive and heroic resuscitative measures, Brother Fox was afflicted with a diffuse cerebral and brain stem anoxia as a consequence of the arrest.
As a result of the anoxia, Brother Fox had remained in a coma without spontaneous respiration and had been maintained by a mechanical respirator. His responses to stimuli were minimal, his right pupil was pinpoint and he was afflicted with myoclonic volleys, which are in the nature of spasmodic movements of the body. Various brain tests, including an electroencephalogram, indicated "minimal activity”. The conclusion of the physicians was that, despite some subsequent changes, Brother Fox is in a deep coma with loss of respiratory function and is in "a permanent vegetative state” with a prognosis of "lethalis.”
The victim of this unhappy fate has, from the age of 16 until the present 66 years later, been a brother in the Membership of the Society of Mary. According to Father Eichner, Brother Fox has spent his many years in this religious order in the service of its goals of education and social welfare, in the pursuance of which he foreswore all secular concerns and took vows of poverty, chastity and obedience. Father Eichner stated that Brother Fox has no estate, either real or personal.
The petition, pursuant to sections 78.01 and 78.03 of the New York Mental Hygiene Law, asked that Father Eichner be named the committee of the person and property of Brother Fox on the ground that he is incompetent. The petition further requested that the committee be granted the right to withdraw the "extraordinary life support systems” on which Brother Fox is being maintained. Father Eichner stated that this is what Brother Fox would want "if by some miracle [he] were able to communicate with the court”. In the alternative, the petition asked that the committee, Nassau Hospital and Brother Fox’s personal physician be directed to consult about withdrawal of the life support systems and, if such consultation leads to a determination that Brother Fox is not now and will not ever be "capable of rational, sapient or conscious thought”, has irreversible brain damage and is in "a permanent vegetative state”, then an order be entered authorizing the medical authorities and the committee to discontinue the "extraordinary life support systems” without any civil or criminal consequences. The petition further requested that, if *188 the court were to decline to name Father Eichner as the committee for Brother Fox, it named Norbert Mechenbier, nephew of Brother Fox and so-called representative of the next of kin, as committee for the same purpose. The petition indicated that Nassau Hospital had refused to turn off the life support systems.
Also submitted in support of the petition was an affidavit by Norbert Mechenbier purporting to represent the views of Brother Fox’s relatives. Mr. Mechenbier indicated that Brother Fox’s sole surviving relatives are 10 nieces and nephews, of whom he is one. He averred that he had personally spoken to all the relatives about the problem and that all agreed that this petition should be granted.
Based upon all of the foregoing, this court issued an order to show cause on October 23, 1979. The order directed any interested party to show cause on November 7, 1979 why an order should not be issued as requested in the petition. The order also directed that the order and the petition be served upon Brother Fox’s relatives, the District Attorney of Nassau County, the Attorney-General of New York State, the Mental Health Information Service, Nassau Hospital and Dr. Kelly. Finally, the order appointed Robert C. Minion, Esq., guardian ad litem to protect the rights and interests of Brother Fox.
On the return date, the District Attorney of Nassau County appeared and requested time to prepare a position. Accordingly, the court directed that a hearing would be held on November 14, 1979 and, subsequently, that the District Attorney could present his witnesses on November 16, 1979. Subsequent to the hearing, the court received memoranda from the District Attorney and three amici curiae, the New York State Right to Life Committee, Inc., the Human Life Amendment Group and the Catholic Lawyers Guild of the Diocese of Rockville Centre. The amici curiae, although following different lines of reasoning, unanimously concluded that the artificial life support systems maintaining Brother Fox could properly be withdrawn on the facts of this case. The District Attorney opposed any such relief.
II
THE HEARING
From all the evidence presented in this case, this court makes the following findings about Brother Fox’s medical *189 condition. As a result of diffuse cerebral and subcortical anoxia brought on by cardiac arrest suffered on October 2, 1979, Brother Fox lost the ability to then respirate spontaneously and fell into a comatose, vegetative state in which he has since been maintained through use of a respirator. Although certain alterations for the better were detected on October 17 and November 6, 1979, Brother Fox’s condition has since deteriorated. He is in a chronic vegetative and akinetic mute state as a result of which only certain lower vegetative functions operate. The higher functions of the brain, the so-called cognitive and sapient functions, have been lost and it is highly improbable that they will ever return. To the extent that any further improvements may occur, they will relate only to Brother Fox’s vegetative functioning and will occur within the persisting clinical framework of a vegetative state. It was the unanimous conclusion of the physicians who testified in this case, that, to a reasonable degree of medical certainty, there is no reasonable possibility that Brother Fox will ever return from the state he is now in to a condition in which the cognitive and sapient powers of the brain — the ability to feel, see, think, sense, communicate, feel emotions and the like — operate. The prognosis is that Brother Fox, whether on or off the respirator, will die.
In addition to medical evidence, the court also heard testimony about Brother Fox, Father Eichner, the religious community of which they are a part and the religious views adhered to by the community. Parenthetically, the court notes that insofar as evidence concerning religious subjects has been considered, it has been the court’s consistent purpose solely to examine the evidence for the light it sheds on the secular concerns of the court. (See Matter of Quinlan, 70 NJ 10.)
Brother Fox is a member of the Society of Mary, a religious congregation within the Roman Catholic Church. The society, among other things, has for 50 years run Chaminade High School in Mineóla, New York. The religious community at Chaminade, of which Brother Fox is a part, lives on the premises of the school and centers its life around the school. The members of the community take vows of poverty, chastity and obedience and live a common life, working and praying together, taking care of one another, living in a spirit of religious kinship.
Brother Fox himself took the vows, which are said to be traditional for priests of the Roman Catholic Church. He *190 renounced all ownership of property and the society undertook to care for his earthly need. He vowed obedience to his religious superiors and to the society in general and in fact lived a life of religious obedience for 66 years. The vow of obedience is not, however, a renunciation of the right of conscience. Had Brother Fox expressed a desire to receive extraordinary life support systems under all circumstances, the vow of obedience would in no way have affected the brother’s ability to so choose.
The petitioner, Father Eichner, first came to know Brother Fox in 1953. At that time, Father Eichner was a novice, which means that he was beginning his life as a priest. Brother Fox was then the assistant to the master of novices and was in charge of supervising and organizing the work of the community. Father Eichner lived with Brother Fox for a year and a half. Thereafter, as Father Eichner pursued his religious and intellectual training, he met Brother Fox from time to time. The brother visited Father Eichner when the latter was studying in Switzerland.
Similarly, Father Francis T. Keenan, provincial superior of the Society of Mary residing at Chaminade, first came to know Brother Fox when he went to the novitiate in 1951. He kept in touch with Brother Fox in succeeding years.
The Society of Mary has a policy which permits brothers who are retiring from active life to choose the community in which they would like to live. In 1970, after many years of service, Brother Fox decided to retire and chose to live at Chaminade, of which Father Eichner was the superior. The Chaminade community was and still is a very active and very young one. Brother Fox assumed a special place in the community and his vibrancy despite his years, his love of life and his religious devotion evidently made him something of an inspirational figure. Chaminade became his home and the members of its community his family. The petition stated that Brother Fox became "the spiritual and patriarchal leader of the community” and "a living example to all men of God at Chaminade High School as to what a truly dedicated, simple religious life could produce.”
Although Brother Fox’s health was generally excellent, in 1976 he began to lose his vision as a result of a sclerotic retina and eventually became about 85% blind. He learned to live with this disability and continued to be active. He managed to keep informed about everything that was going on, especially *191 in the church, by listening to tapes. However, he depended on the young members of the community to read to him and to keep him in touch with life. As a result, the bond between Brother Fox and his younger compatriots grew stronger.
Brother Fox also maintained relationships with his relatives, who are now 10 nieces and nephews. He sent letters regularly and, on his vacation each year, it was his custom to travel around the country and visit his family. He was active and alert and got along very well with the children of his nieces and nephews. He was held in great regard by his family, especially because of his strong religious commitment.
Father Eichner, in his role as the superior of Chaminade community, has been responsible for Brother Fox’s temporal and spiritual welfare since he came to Chaminade. Beyond this formal relationship, a strong personal relationship developed between them over the years and Brother Fox became a kind of father to the petitioner.
Consistent with his general vibrancy of spirit, Brother Fox kept a roof garden on which he labored strenuously. At approximately the end of August, 1979, he strained himself moving some large tubs of flowers and was advised by Dr. Kelly to undergo a hernia operation. On October 1, 1979 Brother Fox entered Nassau Hospital. Father Eichner and Father Keenan visited him on the morning of October 2, at which time he was in fine spirits and fully prepared for the operation.
After the events of October 2, Father Eichner had extensive discussions about Brother Fox’s medical condition and what could be done about it. Among other things, the members of Brother Fox’s family were contacted and the Chaminade community and the provincial council discussed the situation. It was ultimately decided, without objection from the religious community or Brother Fox’s family, that the present petition should be brought.
Norbert Mechenbier, Brother Fox’s nephew, testified that he supported the present petition and that he had contacted all of Brother Fox’s relatives about it. Those relatives also were served with the petition and supporting papers and have not submitted any opposition to it.
Mr. Minion, the guardian ad litem, investigated the facts relating to the petition and reported his recommendation to the court. Mr. Minion contacted the associates and relatives of Brother Fox and found nothing to detract from the position *192 presented in the petition about the character of Brother Fox, the nature of his religious family and his place in it, and the attitude of his religious and personal family to the relief sought. In particular, Mr. Minion personally contacted Brother Fox’s nephews and nieces and elicited from them no objections to the petition. He recommended that the petition be granted.
The Chaminade community discussed the case of Karen Ann Quinlan on repeated occasions in 1976. Concerned about the appropriate moral and spiritual response to the dilemmas posed by the case, the community had occasion to discuss at length the position taken by Pope Pius XII in 1957 in a well-known allocution to a group of anaesthesiologists. The Pope concluded that it was morally and spiritually proper for adherents of the Roman Catholic Church to direct that use of extraordinary life support systems be terminated when there is no longer reasonable hope of recovery. The community also discussed the statement of Lawrence B. Casey, Bishop of Paterson, in the Quinlan case. Bishop Casey, applying the principles set forth by Pope Pius XII, concluded that continued use of a respirator for Karen constituted extraordinary means of treatment, given the fact that there was no reasonable hope of recovery, and that termination of the treatment was morally sound. Being members of a religious group, the Chaminade community frequently discussed life, death and life after death and how properly to integrate the life of this world with that of the next. The Chaminade community was particularly concerned about the moral and spiritual issues raised by the Quinlan case because of the community’s function as a teacher of religious and ethical principles. After these discussions, the community unanimously agreed with the position of Bishop Casey. Brother Fox was an active participant in these discussions, especially inasmuch as various community members read to him articles on the subject which his eye affliction prevented him from reading himself. During these discussions of the Quinlan case, Brother Fox not only repeatedly expressed agreement with the church’s teaching on the subject of the withdrawal of extraordinary life support systems but also stated that he personally would not want any of this "extraordinary business” done for him under such circumstances. (The court notes that the moral and spiritual position which underlines the view of the Chaminade *193 community has recently been approved by John R. McGann, Bishop of Rockville Centre. In a message relating specifically to the condition of Brother Fox, Bishop McGann stated that if mechanical life support systems will not result in any appreciable benefit, they would cause an unnecessary prolongation of the natural process of dying and can rightly be called extraordinary. Such extraordinary means can properly be withdrawn said the bishop.)
On a Saturday morning two months prior to his entry into the hospital, Brother Fox discussed the subject of withdrawing extraordinary life support systems with Father Keenan. On that occasion, he reiterated that he would not want such treatment if his condition were hopeless and would not wish the process of death to be prolonged. Brother Fox also told Norbert Mechenbier that being alive to him was more than the simple vegetative process of respiration. In his investigation Mr. Minion found nothing to cast even the slightest doubt upon the accuracy of these statements.
The position taken by Brother Fox in regard to extraordinary life support systems is consistent with other views held by him. As a member of the Society of Mary, he has believed throughout his long adult life in an afterlife which is a reward for proper conduct in this life. In fact, on prior trips to the hospital he had so fully prepared himself for death that he told his fellows in the community where everything was in his room and gave away some possessions. Similarly, it is the custom of the Chaminade community to read aloud at a morning religious service the names of members of the society who had previously died on that date and Brother Fox was very concerned that that custom always be observed because he looked forward to joining them.
From observation during the course of the hearing and from a studied review of the testimony of Father Eichner, Father Keenan, Norbert Mechenbier and Robert C. Minion, this court finds that Brother Fox opposed the continued use of life supporting systems like respirators when the chance for recovery from a persistent vegetative state is largely nonexistent and, were he competent at this moment, he would order a termination of the life supporting respirator. The evidence, which was unchallenged at every turn and unimpeachable in its sincerity, compels this conclusion.
*194 THE LAW
I
INCOMPETENCY AND APPOINTMENT OF A COMMITTEE
Traditionally, medicine and the law identified the time of death as the point at which spontaneous respiration and heart activity ceased. However, significant technical advances in medical science which have given rise to dilemmas such as that posed by this case have also created questions about the validity of this standard of death. Certain criteria relating to brain functioning have been suggested as the basis for a medical standard of death, most notably the criteria of the Ad Hoc Committee of Harvard Medical School. (See, e.g., Matter of Quinlan, 137 NJ Super 227 [Muir, J.].) The law of this State does not define death in similar terms, although legislation to make irreversible cessation of total brain function a standard of death has been introduced. (E.g., A 1607 [by Member of the Assembly Nadler, Jan. 18, 1979]; A 7104-A [by Member of the Assembly Tallón, April 2, 1979].) There is no need here to decide the question of whether or not the cessation of brain functioning should be recognized by the law as an acceptable definition of death in the absence of legislation on the point. The expert medical testimony adduced in this case is consistent in concluding that, by any medically acknowledged standard of death, Brother Fox is alive. He is therefore in a state similar to that of Karen Ann Quinlan — medically and legally alive but in a persistent vegetative condition. (Matter of Quinlan, supra, pp 243-248.)
Section 78.01 of the New York Mental Hygiene Law provides that this court has jurisdiction over the custody of a person and his property "if he is incompetent to manage himself or his affairs by reason of age, alcohol abuse, mental illness, or other cause”. Section 78.03 of the statute provides that any person may commence a proceeding to declare a person incompetent and to appoint a committee.
On the facts found here it must be concluded that the appointment of a conservator on the ground that Brother Fox has suffered "substantial impairment of his ability to care for his property or has become unable to provide for himself’ (Mental Hygiene Law, § 77.01) would be inappropriate and not in his best interests. (See Mental Hygiene Law, § 78.02.) Instead the facts dictate that Brother Fox is "incompetent to manage himself or his affairs”. The condition afflicting him is *195 not merely a general weakening of his capacities by virtue of advanced age. (See Matter of Pasternack, 23 AD2d 551.) Rather, as a result of the cardiorespiratory arrest which occurred on October 2, 1979, Brother Fox’s cognitive powers have been destroyed; his brain no longer is capable of functioning except in the biologically most rudimentary manner. The medical testimony is uniform that Brother Fox will in all reasonable probability never regain the higher functions of the brain necessary to permit him to manage himself or his affairs. There can therefore be no question but that Brother Fox is incompetent. No stigma can attach to Brother Fox as a result of this conclusion because his lamentable condition results from a sudden and overwhelming physical impairment. There is no question of any future dispute about Brother Fox’s property because, as a result of his religious vow of poverty, he has none. (Cf. Matter of Emerson [Schein], 73 Mise 2d 322.) In a case of such extreme incapacity in which no serious property rights are involved and the central issue concerns the extent of future life sustaining treatment, the appropriate course is the appointment of a committee of the person and property.
The law of this State in general prefers that the next of kin be appointed the committee for an incompetent rather than a stranger. However, in appropriate circumstances, an individual other than a relative may be appointed the committee even though surviving relatives can be located. The factor of paramount importance is what the best interests and welfare of the incompetent require. (Matter of West, 13 AD2d 599; Matter of Dietz, 247 App Div 366.)
On the facts presented here, the petition for appointment as committee for the incompetent should be granted. For all of his adult life, Brother Fox has lived apart from the members of his natural family. He chose to divorce himself from the ordinary concerns of daily life and from the routine form of human relationships common among most members of our society. Out of deep felt religious beliefs, he has made sacrifices which most people would consider extraordinary by the standards current among us. He chose to adopt a new religious family, not out of scorn for his natural ties but rather out of a belief in high religious ideals. This religious family has cared for him throughout his life and he in turn has devoted himself totally to its charitable and educational endeavors. Brother Fox’s nephew, Mr. Mechenbier, stated that *196 Brother Fox had indicated to him over the years that he regarded the religious community at Chaminade as his family. Under these conditions, it is appropriate to name Father Eichner, a long-time friend, the religious superior of Brother Fox and, in a sense, the head of his religious family, as his committee. Father Eichner stated that it has been his duty to look to Brother Fox’s welfare throughout his stay at Chaminade and this court is confident, based upon personal observations of him during the hearing, that he will continue to fulfill that duty. There are present here no facts which could give rise even to the faintest inferences of improper motives on the part of the petitioner. Furthermore, Brother Fox’s natural relatives unanimously concur in petitioner’s request. Therefore, Father Eichner will be empowered to act as the committee for the incompetent, Brother Fox.
Of course, the truly troublesome question in this case is whether the remaining request of the petition should be granted in some form or other.
II
THE INDIVIDUAL’S RIGHT TO CONTROL HIS PERSON
Father Eichner argues that this court should authorize the termination of the "extraordinary life support systems” which are now maintaining Brother Fox’s life. The legal basis offered for this argument is "that to maintain the life support system of an unwilling patient is an invasion of his constitutionally guaranteed right of privacy.”
The Constitution of the United States does not explicitly provide protection for privacy as such. Certain explicit guarantees do insure the integrity and security of the individual from governmental intrusion, particularly the First Amendment, the Fourth Amendment and the self incrimination clause of the Fifth Amendment, but the right claimed by the petitioner does not find distinct expression in these guarantees. However, in Griswold v Connecticut (381 US 479) the Supreme Court found that a right of privacy was encompassed within the penumbras or perepheries of certain provisions of the Bill of Rights.
The right of privacy was more clearly elucidated in Roe v Wade (410 US 113). There, the court extracted from prior cases, including Griswold, a recognition of a constitutional *197 right of privacy. The basis for this right was held to be the concept of liberty secured by the Fourteenth Amendment. This right of privacy, the court held, is not absolute but may be curtailed upon the demonstration of a "compelling state interest.”
Petitioner urges that this right of privacy "is broad enough to. encompass a patient’s decision to decline medical treatment.” In support of this proposition, petitioner relies upon Matter of Quinlan (70 NJ 10, supra) and Superintendent of Belchertown State School v Saikewicz (— Mass —, 370 NE2d 417).
Quinlan involved Karen Ann Quinlan, an unfortunate young woman 20 years of age, who, for reasons that were unclear, ceased breathing for at least two periods of 15 minutes each. As a result, she suffered severe brain damage and lapsed into a comatose condition which was characterized by her physicians as a "chronic persistent vegetative state.” For an extended period of time, she was maintained on a respirator without the aid of which the physicians believed she would die. (Matter of Quinlan, supra, at pp 23-25.) The evidence indicated that no form of treatment known to medicine could alleviate or even improve her tragic state. (Matter of Quinlan, supra, at p 26.) The father of the victim petitioned the Superior Court for an adjudication of Karen’s incompetency and for appointment as guardian for her person and property. Mr. Quinlan sought express power to authorize the discontinuance of all "extraordinary medical procedures” being used to keep his daughter alive. (Matter of Quinlan, supra, p 18.)
The New Jersey Supreme Court recognized the constitutional right of privacy referred to above and concluded that this right is presumably "broad enough to encompass a patient’s decision to decline medical treatment under certain circumstances”. (Matter of Quinlan, supra, p 40.) The court also recognized that the State has contrary interests, principally the preservation and sanctity of all human life. Balancing these interests, the court concluded: "We think that the State’s interest contra weakens and the individual’s right to privacy grows as the degree of bodily invasion increases and the prognosis dims. Ultimately there comes a point at which the individual’s rights overcome the State interest. It is for that reason that we believe Karen’s choice, if she were competent to make it, would be vindicated by the law. Her prognosis is extremely poor — she will never resume cognitive life. And *198 the bodily invasion is very great”. (Matter of Quinlan, supra, at p 41.)
In Superintendent of Belchertown, authorities of a Massachusetts mental health facility petitioned a court to appoint a guardian for Joseph Saikewicz, a person mentally retarded from birth who was suffering from leukemia and in need of prompt medical treatment. A guardian ad litem was appointed who reported his findings to the court wherein he found that Mr. Saikewicz’ illness was incurable and invariably fatal. Although the appropriate medical treatment for the illness was chemotherapy, the guardian recommended against it on the ground that the adverse side effects and discomfort which it would cause outweighed the limited extension of life that might possibly result. After a hearing, the court essentially accepted the recommendation of the guardian ad litem. On appeal, the Supreme Judicial Court of Massachusetts agreed. (— Mass, supra, at p —.) Approximately two months later, Mr. Saikewicz died of a complication of the leukemia. (— Mass, supra, at p —.)
The Massachusetts court followed the same approach as the Quinlan court with regard to the question of a constitutional right of privacy, referring to it as "the unwritten constitutional right of privacy found in the penumbra of specific guarantees of the Bill of Rights.” Relying on Quinlan, the court concluded that "this constitutional guaranty * * * encompasses the right of a patient to preserve his or her right to privacy against unwanted infringements of bodily integrity in appropriate circumstances.” (— Mass, supra, at p —.) The same court recognized the countervailing interest of the State in the preservation of human life but qualified that interest as follows (supra, p —): "There is a substantial distinction in the State’s insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether but when, for how long, and at what cost to the individual that life may be briefly extended. Even if we assume that the State has an additional interest in seeing to it that individual decisions on the prolongation of life do not in any way tend to 'cheapen’ the value which is placed in the concept of living * * * we believe it is not inconsistent to recognize a right to decline medical treatment in a situation of incurable illness. The constitutional right to privacy, as we conceive it, is an expression of the sanctity of individual free choice and self-determination as fundamental constituents of *199 life. The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the right of choice.”
The court also recognized State interests in protecting third parties, especially children, against the harmful results which might flow from the decision of a competent adult to refuse life sustaining treatment and in maintenance of the ethical integrity of the medical profession. The former interest was inapplicable in the Saikewicz case and the latter was held consistent with the apparently prevailing medical practice to recognize that comfort is often more important for the dying than treatment. The court relied upon Quinlan as support for the second of these conclusions. (— Mass, supra, at p —.)
Although urged by petitioner to do so, this court will not pass upon the applicability of the constitutional right of privacy to the circumstances of this case. Petitioner and the authorities upon which he relies do not confront several considerations which appear relevant to the issue posed. First, a variety of activities which may be characterized as private may nevertheless not be automatically incorporated into the constitutional right. (See Cantor, Quinlan, Privacy, and the Handling of Incompetent Dying Patients, 30 Rutgers L Rev 243, 245-248.) More importantly, if the constitutional right of privacy may be said to encompass the decision to terminate life sustaining medical treatment, there are evidently certain prerequisites to the establishment of that right to which petitioner has not referred. For example, because the right of privacy is protected by the "Fourteenth Amendment’s concept of personal liberty and restrictions upon state action” (Roe v Wade, 410 US 113, 153, supra), it is not necessary to the establishment of a violation of that right that "State action” be involved? (See Schlein v Milford Hosp., 561 F2d 427; Robinson v Price, 553 F2d 918; Greco v Orange Mem. Hosp. Corp., 513 F2d 873, cert den 423 US 1000.) Petitioner has not shown the inapplicability of this principle, nor has he demonstrated that Nassau Hospital is a State institution or so imbued with State concerns that its actions satisfy the "State action” requirement. The specification of these two areas of concern to this court is not intended to be an exhaustive survey but rather to illustrate the reasons that motivate the determination not to adopt the constitutional right of privacy advanced by petitioner.
The resolution of the awesome question posed by this case, *200 literally one of life and death for Brother Fox, may hereafter profoundly affect all citizens of this State. No one can foresee the nature of future petitions seeking to apply the conclusion reached here. This consideration also underlines this court’s determination not to base a conclusion on the claim of a right of privacy that is insufficiently defined but nevertheless so attractively worded as to invite unrestrained applications made in its name. Only the petition on behalf of Brother Fox seeks disposition here. (See Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L Rev 1, 8-9.)
However, the petition must be viewed in the light of existing and relevant common-law rights. The common law has long reflected a concern for the individual’s right of self-determination. In Union Pacific Ry. Co. v Botsford (141 US 250, 251), the court stated that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.” Where medical treatment is concerned, the common law has recognized a civil action for damages for treatment in the absence of the patient’s informed consent. As Judge Cardozo said, "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient’s consent, commits an assault, for which he is liable in damages.” (Schloendorff v Society of N. Y. Hosp., 211 NY 125, 129-30; accord Fogal v Genesee Hosp., 41 AD2d 468, 473; Darrah v Kite, 32 AD2d 208, 210-211.) The law clearly requires that the consent be informed, based upon all information necessary under the circumstances. (Abril v Syntex Labs., 81 Misc 2d 112, 113; Barnette v Potenza, 79 Misc 2d 51, 54-55.) The statutory and administrative law of the State embodies the same concern for self-determination on the part of the patient. (See Public Health Law, § 2803-c.) It is required by 10 NYCRR 405.25 (a) (5) that hospitals establish written policies which afford each patient, among other things, the right to "receive from his physician information necessary to give informed consent” and the right to "refuse treatment to the extent permitted by law”. (10 NYCRR 405.25 [a] [6].)
As the Supreme Court indicated in Union Pacific Ry. Co. v Botsford (supra) this right to self-determination is, like other *201 rights, not without its limitations. The question of whether or not the right extends to the rejection of life sustaining medical treatment by a competent adult has been considered in a number of cases, with a variety of results.
In Matter of Erickson v Dilgard (44 Misc 2d 27) Mr. Justice Meyer of this court (now Judge Meyer of the Court of Appeals) was faced with an application by the county hospital for an order authorizing administration of a blood tranfusion to a patient. The evidence disclosed that the hospital had advised the patient, who had been admitted voluntarily, to submit to an operation to stop gastrointestinal bleeding, along with a blood transfusion. The patient did not object to the operation but did refuse to submit to a blood transfusion. The hospital contended that the operation was necessary, that there was a considerable chance that the patient would not recover without the blood, and that the patient’s decision to forego the transfusion was equivalent to suicide, in violation of the Penal Law. Justice Meyer rejected this argument, stating that it is always a question of judgment whether a medical opinion is correct or not. The court concluded that the application should be denied (44 Mise 2d supra, at p 28): "[I]t is the individual who is the subject of a medical decision who has the final say * * * [TJhis must necessarily be so in a system of government which gives the greatest possible protection to the individual in the furtherance of his own desires.”
In Palm Springs Gen. Hosp. v Martinez (Civil No. 71-12687 [Dade County Cir Ct, filed July 2, 1971], discussed in Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L Rev 1, 13-14), a 72-year-old woman was suffering from a terminal illness. She refused transfusions and an operation even though death was certain without treatment because she did not want anyone to "torture” her any longer with further surgery. Upon application by her physician for clarification of his duty, the court ruled that the woman could not be forced to undergo the surgery. She died shortly thereafter. Mrs. Martinez based her objection to the treatment proposed not on any religious belief but evidently upon a simple desire to die in peace. The court accepted her decision, which was made competently and with knowledge of the inevitable consequences. Said the court: "Based upon [her] debilitated physical condition * * * and the fact that performance of surgery * * * and administration of further blood transfusions would only result in the painful extension of her life for a *202 short period of time, it is not in the interest of justice for this Court of Equity to order that she be kept alive against her will. A conscious adult patient who is mentally competent has the right to refuse medical treatment, even when the best medical opinion deems it essential to save her life.” (44 Fordham L Rev 1, 14.)
In Matter of Long Is. Jewish-Hillside Med. Center v Levitt (73 Misc 2d 395) a hospital sought authorization for the amputation of the left leg of an 84-year-old man afflicted with gangrene. As a result of arteriosclerotic heart disease, the patient was incompetent to decide whether or not he wished to submit to this treatment, which was immediately necessary in order to save his life. Although the case involved incompetency, it is nevertheless clear that, had the patient been competent to decide upon the course of treatment, the court would have accepted his decision. (See 73 Misc 2d supra, at pp 397-398.)
Courts have also reached similar conclusions when the patient has asserted that the treatment proposed would conflict with his religious beliefs. In Matter of Brooks v Brooks (32 Ill 2d 361), a lower court appointed a conservator of the person of a competent adult woman for the purpose of consenting to blood transfusions. She was in the hospital for a peptic ulcer but declined to undergo transfusions because she adhered to religious notions which forbade them. The lower court appointed the conservator and the transfusions were successfully performed. On appeal, the Supreme Court of Illinois concluded that the lower court had violated the woman’s constitutional right to practice her religious beliefs. (32 Ill 2d, supra, at pp 372-374; see, also, Matter of Melideo, 88 Misc 2d 974; Holmes v Silver Cross Hosp. of Juliet, Ill., 340 F Supp 125.) The court did, however, recognize that the right to exercise one’s religious beliefs by declining medical treatment which would violate them is not unlimited. (32 Ill 2d, supra, at pp 366-372.)
Other cases have rejected the right to refuse treatment in particular situations on the ground that State interests prevailed. For example, one court permitted a blood transfusion to be given over a patient’s religious objections because of State interests in protecting the patient’s minor children from abandonment, protecting the desire of physicians to act to save life and preventing suicide where the patient could readily be restored to life. (Matter of President & Directors of *203 Georgetown Coll., 331 F2d 1000, cert den 377 US 978; see, also, Kennedy Mem. Hosp. v Heston, 58 NJ 576.) In United States v George (239 F Supp 752), the court ordered a transfusion for a father of four who had refused the transfusion for religious reasons. The court emphasized the importance of permitting physicians to follow their consciences.
From all of the foregoing, it is clear that there is a common-law right to bodily self-determination, which includes the right of a competent adult to refuse life sustaining medical treatment. This general right is, however, subject to being overridden by State interests in appropriate circumstances. Among the State interests which must be weighed are interests in the protection of third parties, such as minor children, the maintenance of latitude for physicians and hospitals to fulfill their ethical obligations and, by far the most important, the preservation of all human life.
The protection of third parties is not at issue here. The State interest in the preservation of life is applicable and is troubling. This State concern encompasses an interest in the preservation of particular life, and, beyond that, an interest in insuring against the cheapening of life in general as a result of individual decisions. (See Superintendent of Belchertown State School v Saikewicz, — Mass —, —, supra.) It is unnecessary, and, given the limited judicial role of this court, inappropriate to attempt to set forth a test by which the rights should generally be balanced. Similarly, the court need not and does not suggest what decision ought to be reached in different cases under other circumstances. All that is concluded is that Brother Fox, having been afflicted at his very advanced age with the most severe physical ailments — with irreversible brain damage which has destroyed all of the higher functions of the mind and which has left him suspended in a purely vegetative condition (and that only with the aid of machines) —is entitled to decline treatment.
The State interest in the preservation of life should not, under these most extreme of circumstances, require that Brother Fox be made, against his will, to submit to treatment which cannot serve any medical purpose and which in this situation merely interferes with the natural process of dying. The State interest in the preservation of Brother Fox’s life is, in view of the extreme conditions affecting him, insufficiently strong to override the right of Brother Fox to choose for himself whether or not to submit to continued treatment. *204 Balancing of the State interest in the preservation of all life, the interest, that is, in insuring that life does not lose its inviolability or become cheapened, is more problematic. However, acknowledging Brother Fox’s right to choose in these extreme circumstances will not undermine this State interest. It must be recalled that Brother Fox is in his present predicament because medical science, in conformance with its duty to do its utmost to preserve life, has brought a variety of artificial means to bear in an effort to restore Brother Fox to health. These exertions having failed and the patient being now maintained by machines in a hopeless condition, Brother Fox should not be barred from ending a treatment which, in these circumstances, serves only more or less briefly to extend the process of dying. To recognize Brother Fox’s right to decide to terminate an artificial life sustaining treatment in these narrow and extreme circumstances does not undermine the State’s interest. Indeed, the courts of this State have already recognized the right to decline life preserving treatment even though the patients’ reasons for doing so were, by normal standards, irrational. (See Matter of Erickson v Dilgard, 44 Misc 2d 27, supra; Matter of Melideo, 88 Misc 2d 974, supra.) Here, by contrast, the right is raised under such circumstances that its exercise would be entirely rational and understandable.
This court is aware of the concern of the medical profession to provide to all patients the fullest medical attention possible in accordance with the ancient obligations of the profession. The court notes that the physicians who have testified in this case have demonstrated a devotion to these obligations which is to be applauded. However, the medical testimony is convincing that the State’s interest in affording the medical profession full opportunity to carry out its functions should not outweigh Brother Fox’s right to choose. In this regard, it might well be noted that it is important that the law not create a disincentive to the fullest treatment of patients by making it impossible for them in at least some extreme circumstances to choose to end treatment which has proven unsuccessful.
If this court were to conclude that Brother Fox’s right to self-determination should be exercised in accordance with his wishes, the question arises whether the exercise of the right would constitute suicide. (Kennedy Mem. Hosp. v Heston, 58 NJ 576, 580-581, supra; Matter of the President & Directors of *205 Georgetown Coll., 331 F2d, supra, at pp 1008-1009 [both holding that the refusal of life preserving medical treatment on religious grounds would constitute suicide].) Subdivision 3 of section 125.15 of the New York Penal Law provides that a person is guilty of manslaughter in the second degree if he intentionally causes or aids another person to commit suicide.
In a scholarly article, Professor Robert M. Byrn of Fordham Law School analyzed the issue of suicide in this context and discussed, inter alla, the Georgetown Coll, and Heston cases. (Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L Rev 1, 16-24.) As Professor Byrn notes, suicide at common law required that an individual "purposefully set in motion a death-producing agent with the specific intent of effecting his own destruction, or, at least, serious injury.” (Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L Rev 1, 16.) Neither of the patients in Georgetown Coll, and Heston satisfied this standard. In each instance, the patient did not have a specific intent of effecting his own destruction, nor had the patient set a death producing agent in motion. The same is overwhelmingly true of Brother Fox. If it could be determined that Brother Fox desired that life preserving treatment be ended under the circumstances present here, that desire would fall well short of the necessary specific intent. Similarly, it could not be said that Brother Fox had set a death producing agent in motion. As Professor Byrn states: "[He would] not claim a right of affirmative self-destruction but a right, in a sense, to allow 'nature’ to take its course. It is not [he], but the natural progress of [his] ills, which will destroy [his life]. [His] conduct manifests a kind of pacifism, a fatalistic attitude far removed from the 'extreme forms of aggression’ of the suicidal person who makes war on his own life.” (Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L Rev 1, 20.)
Furthermore, no criminal responsibility would attach to persons authorized by this court to withdraw the respirator. The District Attorney concedes that subdivision 1 of section 35.05 of the New York Penal Law provides for such a result, although he argues that no such authorization would in fact be proper here. Thus, if this court were to find that the respirator could be withdrawn because of Brother Fox’s desire to decline such treatment under the circumstances present here, that cessation of treatment would not give rise to *206 criminal responsibility on the part of those authorized to effect it.
In sum, this court concludes (a) that the common-law right of bodily self-determination permits a competent adult to refuse life sustaining medical treatment but that this right is subject to certain State interests; (b) that the State interests, especially the interest in the preservation of life, do not outweigh Brother Fox’s right of self-determination in the circumstances present here; (c) that exercise of the right of Brother Fox to decline medical treatment in these circumstances would not give rise to civil liability on the part of those providing medical treatment to him; and (d) that implementation of Brother Fox’s choice would not constitute a suicide or give rise to criminal responsibility for homicide or assisting another to commit suicide.
Ill
EXERCISE OF THE RIGHT OF BODILY SELF-DETERMINATION
Because Brother Fox is, at present, incompetent and unable to express his desires, the petitioner seeks authorization to exercise the right of bodily self-determination on his behalf. Essentially, petitioner relies once again upon Matter of Quinlan (70 NJ 10, supra) and Superintendent of Belchertown State School v Saikewicz (— Mass —, supra) in support of this aspect of the relief requested.
In Quinlan, as noted above, the Supreme Court of New Jersey recognized the existence of a constitutional right of privacy and concluded that Karen could properly exercise the right to refuse the intensive life sustaining treatment, especially a respirator, which was being administered to her. Because Karen was then grossly incompetent, the court decided that her right of privacy could be asserted for her by her guardian: "If a putative decision by Karen to permit this non-cognitive, vegetative existence to terminate by natural forces is regarded as a valuable incident of her right of privacy, as we believe it to be, then it should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice. The only practical way to prevent destruction of the right is to permit the guardian and family of Karen to render their best judgment * * * as to whether she would exercise it in these circumstances. If their conclusion is in the affirmative this decision should be accepted by a society the *207 overwhelming majority of whose members would, we think, in similar circumstances, exercise such a choice in the same way for themselves or for those closest to them. It is for this reason that we determine that Karen’s right of privacy may be asserted in her behalf, in this respect, by her guardian and family under the particular circumstances presented by this record.” (Matter of Quinlan, 70 NJ, supra, at pp 41-42.)
In Superintendent of Belchertown State School v Saikewicz, the court also recognized a constitutional right of privacy in the circumstances present there. Mr. Saikewicz was and always had been profoundly retarded and noncommunicative. Thus unable to determine the patient’s choice in the matter, the Supreme Judicial Court of Massachusetts sought to emphasize the equality of the competent and the incompetent (— Mass, supra, at p —): "To protect the incompetent person within its power, the State must recognize the dignity and worth of such a person and afford to that person the same panoply of rights and choices it recognizes in competent persons. If a competent person faced with death may choose to decline treatment which not only will not cure the person but which substantially may increase suffering in exchange for a possible yet brief prolongation of life, then it cannot be said that it is always in the 'best interests’ of the ward to require submission to such treatment. Nor do statistical factors indicating that a majority of competent persons similarly situated choose treatment resolve the issue. The significant decisions of life are more complex than statistical determinations. Individual choice is determined not by the vote of the majority but by the complexities of the singular situation viewed from the unique perspective of the person called on to make the decision. To presume that the incompetent person must always be subjected to what many rational and intelligent persons may decline is to downgrade the status of the incompetent person by placing a lesser value on his intrinsic human worth and vitality.”
The court recognized the importance of considering evidence of what a majority of people would do in similar circumstances. Nevertheless, it stated that "the primary test is subjective in nature — that is, the goal is to determine with as much accuracy as possible the wants and needs of the individual involved”, even though that "may or may not conform to what is thought wise or prudent by most people.” (— Mass, supra, at p —.) Given Mr. Saikewicz’ incapacity, the court *208 said that it "may thus be necessary to rely to a greater degree on objective criteria” but emphasized that even so "the effort to bring the substituted judgment into step with the values and desires of the affected individual must not, and need not, be abandoned.” (— Mass, supra, at p —.) Therefore (supra, p —): "We believe that both the guardian ad litem in his recommendation and the judge in his decision should have attempted (as they did) to ascertain the incompetent person’s actual interests and preferences. In short, the decision in cases such as this should be that which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person.”
After a review of the competing factors, the court ruled that the decision to withhold chemotherapy from Mr. Saikewicz "was based on a regard for his actual interests and preferences” and was supported by the facts. (— Mass, supra, at p —.)
Respectfully this court is unable to accept the analyses adopted in these decisions. (See, also, Matter of Young, 48 USLW 2238 [Cal Superior Ct, Sept. 11, 1979].)
The Quinlan court (70 NJ, supra, at p 41) permitted Karen’s guardian to exercise her right of privacy because that right should not be "discarded solely on the basis that her condition prevents her conscious exercise of the choice.” But the right to decline life saving treatment is, by its very nature, a right to choose, a right of the individual to make up his or her own mind. Although the court referred to the views of a majority of the members of society, the right in question is to do whatever its possessor desires irrespective of the views of a majority. As the Saikewicz court stated, "[individual choice is determined not by the vote of the majority but by the complexities of the singular situation viewed from the unique perspective of the person called on to make the decision.” (— Mass, supra, at p —.) However phrased, the result of Quinlan was to permit a choice to be made for one person by another. (See Collester, Death, Dying and the Law: A Prosecutorial View of the Quinlan Case, 30 Rutgers L Rev 304, 317; Note, The Tragic Choice: Termination of Care for Patients in a Permanent Vegetative State, 51 NYU L Rev 285, 294-95; Note, In re Quinlan: Defining the Basis for Terminating Life Support Under the Right of Privacy, 12 Tulsa LJ 150, 161; Note, *209 The Right to Die a Natural Death: A Discussion of In re Quinlan and the California Natural Death Act, 46 U Cin L Rev 192, 201; Note, In re Quinlan: One Court’s Answer to the Problem of Death With Dignity, 34 Wash & Lee L Rev 285, 298-299.)
This central difficulty is exacerbated in Saikewicz. The court there emphasized the need to treat incompetents and competents alike (— Mass, supra, at p —), but the inescapable problem is that they are in fact unalike in respect of the capacity relevant to the right — the physical ability to make an informed choice. The court considered what the views of a majority of people would be in the circumstances but concluded that the primary test is a subjective one. (— Mass, supra, at p —.) The court stated that the guardian ad litem and the lower court properly "attempted * * * to ascertain the incompetent person’s actual interests and preferences.” (— Mass, supra, at p —.) Here again, the rationale offered by the court seems unsatisfactory, and this with respect to a conclusion which was admittedly not what a majority of people similarly situated would do. Mr. Saikewicz had all his life been profoundly retarded and noncommunicative and, therefore, any attempt to ascertain his "actual interests and preferences” would be a ritualistic exercise, necessarily doomed to failure. At least in Quinlan there was some indication that Karen had expressed an opinion on the matter and, in any event, her parents could make an informed judgment based upon years of life with her as to what her choice would be. Given his lifelong mental impairment, Mr. Saikewicz never had had any informed opinion on the matter or any informed attitudes toward life in general from which an opinion might be inferred. This obviously was a case in which the court permitted one person to decide what should be done for another. (See Ruby v Massey, 452 F Supp 361, 370-371, n 24.)
In view of the magnitude of the power involved here and the serious implications for the future, this court is constrained to reject the analyses of Quinlan and Saikewicz. However, on the facts of this case, this conclusion does not require the rejection of the relief requested.
As has been found above, Brother Fox had clearly indicated that, under the circumstances and conditions that presently surround and inflict him, he would not consent to continuation of the life supporting respirator. If Father Eichner, his committee, were to request the termination of the respirator, *210 then that request would be the decision of Brother Fox which Father Eichner would merely pass on as a conduit. Unlike Quinlan and Saikewicz, no fiction is created nor is the judgment of Father Eichner substituted for that of Brother Fox.
The District Attorney contends that this court should not consider the evidence of Brother Fox’s intentions on this subject. There is no doubt that this court is obligated to ascertain, if possible, the choice which Brother Fox, now incompetent, would make if he became competent for a moment and consciously faced his afflictions. (See, e.g., Matter of Long Is. Jewish-Hillside Med. Center v Levitt, 73 Misc 2d 395, supra; Matter of Weberlist, 79 Misc 2d 753, 757; Matter of Baby Boy K., 99 Misc 2d 129, 130-131.) Since from the very nature of the case, the testimony of Brother Fox cannot be obtained, other evidence of his wishes should be considered for such worth as it may have, as has been done in somewhat comparable situations. (See Matter of Long Is. Jewish-Hillside Med. Center v Levitt, supra, at pp 398-399; Matter of President & Directors of Georgetown Coll., 331 F2d 1000, supra; Matter of Brooks v Brooks, 32 Ill 2d 361, supra; Holmes v Silver Cross Hosp. of Joliet, Ill., 340 F Supp 125, supra; cf. Note, In re Quinlan: Defining the Basis for Terminating Life Support Under the Right of Privacy, 12 Tulsa LJ 150, 163-164 [suggesting a state of mind basis for the consideration of such statements].) Having heard the testimony and evaluated the witnesses, this court concludes that Father Eichner, Father Keenan and Mr. Mechenbier have no concern here but their regard for Brother Fox’s welfare and desires. Their unchallenged testimony was, in this court’s view totally sincere and entirely trustworthy. The religious background of strong conviction and substantial personal commitment lends further objective credence to this testimony.
Furthermore, the District Attorney questions the probative force of the evidence of the incompetent’s intentions presented here, sugesting that, as in Quinlan, it should be rejected because it shows no more than the incompetent’s "theoretical” desires. However, the situation here is notably different from that in Quinlan. There, a very young woman evidently made certain general remarks on the subject of life supporting treatments. (Matter of Quinlan, 70 NJ, supra, at p 21.) There was no indication that the remarks were made when full and serious consideration was given to their meaning; in any event, in view of her age, Karen could not have been intend *211 ing to express herself on what she could anticipate as a possible problem of some imminence. Here, Brother Fox expressed himself on the subject in the course of very serious discussions among persons who had devoted their lives to their religious beliefs and were greatly concerned about the spiritual and moral issues involved in the Quinlan case. These discussions were plainly not offhand theoretical remarks, but serious examinations of issues of the utmost meaning and significance to Brother Fox and his religious brothers. At the time, Brother Fox, although in generally good health, was 80 years old and obviously, unlike Karen Quinlan, nearing the end of his life. He had seriously prepared himself for death on other occasions and was looking forward to his reward in an afterlife for his sacrifices and good works in this world. He had reiterated his view on the subject as recently as two months before entering the hospital, at a time when he was 83 years of age.
Furthermore, Brother Fox’s expressions were not general and vague so as to give rise to doubt about the application of those expressions to the specific facts here present. The discussions in the Chaminade community involved a consideration of Karen Ann Quinlan’s situation and the position of Bishop Casey with regard thereto. The focus was thus upon precisely the illness and the treatment at issue here — a chronic vegetative state maintained by a respirator. Whatever Brother Fox may have wanted under other circumstances, he clearly expressed his intentions about the situation that now afflicts him.
The District Attorney suggests that this court should not act absent some form of "living will” legislation. Legislation of this type has been introduced, but not yet enacted in this State. (See, e.g., S 5514 [by Senator Leichter, May 8, 1979]; A 65 [by Member of the Assembly Jenkins, Jan. 3, 1979].) Some form of such legislation may perhaps be required if the cessation of artificial life support systems is to be possible under other circumstances, but it is not, in this court’s view, required to effectuate Brother Fox’s right. That right is derived from common-law principles of bodily self-determination and consent to medical treatment and, in view of the evidence of Brother Fox’s desires, need not await an uncertain legislative recognition.
The District Attorney argues that, because of some improvements in Brother Fox’s condition which were observed on *212 November 6, this court should defer a decision for an undetermined period of time. However, all the evidence, including that of the District Attorney’s able physicians, makes clear that these improvements were only in some aspects of Brother Fox’s vegetative existence. As to the possibility of a return to a semblance of cognitive or sapient functioning, the evidence was unequivocal — with reasonable medical certainty, Brother Fox will never regain cognition. Improvements, if they occur, will take place within the framework of a chronic vegetative state. In addition, Dr. Poloukhine testified without challenge that Brother Fox’s condition after November 6 had in fact deteriorated and had reached a plateau.
Over two months have gone by since the incident which brought about Brother Fox’s condition and further time will pass in view of the directions set forth herein in the conclusion of this opinion. The qualification set forth there that Brother Fox’s condition then be substantially the same or worse as outlined herein provides further safeguards. On all the facts present here, further delay would deprive Brother Fox of a right recognized herein without any reasonable hope of medical improvement. All that could be hoped for is certitude which is not possible in this world.
The District Attorney’s reference to a consent form executed by Brother Fox at the time of his entry into the hospital is not persuasive in view of the fact that no evidence was elicited concerning the circumstances surrounding its execution, a consideration of extreme importance since Brother Fox’s vision was very seriously impaired.
Motions made during the course of the hearing, upon which decision was reserved, are decided in the manner indicated.
CONCLUSIONS
Based upon all the credible evidence, this court concludes as follows:
1. That as a result of diffuse cerebral and subcortical anoxia resulting from cardiac arrest Brother Joseph Charles Fox is in a chronic vegetative state and is totally incompetent;
2. That Father Philip K. Eichner, S. M., shall be appointed as committee of the person of Brother Joseph Charles Fox, in which capacity he shall serve without bond;
3. That were Brother Joseph Charles Fox competent he *213 would direct the termination of the respirator that presently supports him;
4. That Father Philip K. Eichner, S. M., as committee, is charged with the responsibility of providing for the care and treatment of Brother Joseph Charles Fox and in pursuance of this responsibility he is authorized and empowered to direct a termination of the respirator presently assisting Brother Joseph Charles Fox upon the following conditions:
(a) Before directing a removal of the respirator from those life supporting systems presently sustaining Brother Joseph Charles Fox, he secure from a physician or physicians of his choice an opinion that the condition of Brother Joseph Charles Fox continues in a chronic vegetative state with no reasonable medical possibility that he will ever regain any sapient or cognitive function or capability. This court will not designate the physician or physicians to be selected by the committee but does commend both Dr. Edward Kelly and Dr. Nicolas Poloukhine whose medical qualifications and whose experience with Brother Joseph Charles Fox’s condition were persuasively demonstrated by their testimony during the hearing in this proceeding;
(b) In scheduling the physical examination described immediately above, the committee shall provide the ofiice of the District Attorney of Nassau County with at least 48 hours’ notice in advance of the date and time of the examination of Brother Joseph Charles Fox in order to provide the District Attorney with an opportunity to have a representative or representatives present for the purpose of observing what transpires. While this court will not designate the physicians, if any, to be selected by the District Attorney, should he decide to avail himself of the opportunity to be represented, the court does commend both Dr. Eli Goldensohn and Dr. Richard Beresford whose qualifications and whose experience with the condition of Brother Joseph Charles Fox were persuasively demonstrated during the hearing in this proceeding;
5. That if, upon compliance with the conditions described above, the respirator is removed from the life support systems of Brother Joseph Charles Fox by termination of its use, such action shall not give rise to either civil or criminal liability on the part of any participant, whether committee, physician, hospital or others;
6. That the authorization to direct termination of the respirator is confined to that apparatus only, all other supporting *214 systems or treatments presently being applied to Brother Joseph Charles Fox shall continue in the manner the attending physician shall determine.
[Portions of opinion omitted for purposes of publication.]