OPINION OF THE COURT
David O. Boehm, J.
In Matter ofEichner (Fox) (102 Misc 2d 184, affd 73 AD2d 431) it was established that the court has the power, upon request of a duly appointed committee, to order termination of extraordinary life-sustaining treatments being administered to a person whose affliction has rendered him permanently comatose and, therefore, unable to make an intelligent and articulate choice with respect to continuation of the treatments. The present case presents a novel and slightly more complicated question equally without precedent in New York, i.e., whether a committee for someone dying of bladder cancer who has been incompetent since birth due to mental retardation may compel by court order the termination of repeated blood transfusions which are being administered for the sole purpose of extending his life.
The case comes before the court by an application brought by the Newark Developmental Center, an institution operated by the Office of Mental Retardation and Developmen *881 tal Disabilities (hereinafter the Center) pursuant to section 33.03 (subd [b], par 4) of the Mental Hygiene Law and 14 NYCRR 27.9 (b), its corresponding regulation, for an order directing continuation of the periodic blood transfusions currently being administered to John Storar, a lifelong resident of the Center, to replace the blood loss due to bleeding from his bladder through his urinary tract because of bladder cancer.
By cross motion, Mrs. Dorothy Storar, the incompetent’s 77-year-old widowed mother, seeks an order terminating the transfusions. At the hearing held before me, she moved to be appointed committee of the person and property of her son. All necessary parties being present and having no objection, her application was granted.
Although Matter of Eichner (Fox) (supra), dealt with a patient in a permanent vegetative coma, I find that it provided for the court’s authority to grant relief in this situation as well and that the procedures required by the Second Department in that case are also applicable to this case. Accordingly, by my order, the District Attorney of Wayne County where the Center is located was made a party to this proceeding. In addition, on July 9,1980, Arlene A. Hughes, the Deputy Director and counsel of the Mental Health Information Service, was appointed guardian ad litem of Storar (see Matter of Strauss, 56 AD2d 570).
Storar is and always has been profoundly mentally retarded. His IQ has been assessed at between 10 and 20, with a corresponding mental age of between one and one half and two. He is able to recognize some people and understand some verbal communication. At one time he had some vocabulary, but no longer does and for some time has been able to express himself only by grunts and growls. He is unable to adhere to daily routines and requires constant supervision.
Storar’s condition was first diagnosed in July, 1979 when, after a series of tests and X rays, a finding of invasive, transitional carcinoma (cancer) of the bladder was made. On March 17, 1980, after radiation therapy and other treatments had been tried, Storar’s condition was diagnosed as terminal and incurable.
*882 The cancer has since metastasized to Storar’s lungs and the medical testimony indicates probable metastasis to his liver and brain as well. Neither radical surgery, chemotherapy nor radiation are indicated as viable courses of treatment. Moreover, the bleeding of the lesions cannot be controlled by cauterization. Fulguration has been attempted on several occasions without success. There is, unfortunately, no known mode of treatment for Storar except to make him as comfortable as possible.
On May 13, 1980, Storar’s attending physicians ordered blood transfusions for the first time. The bleeding, caused by the bladder cancer, had by this time become so severe that Storar was losing massive quantities of blood. At the time of the hearing the transfusions were being administered on the average of once every eight days.
When the transfusions first started, Storar did not require restraint. However, on July 25,1980, Storar had to be physically restrained during administration of the transfusion and thereafter, on August 18, he had to have his arm tied down to prevent him from pulling out the needle.
The transfusions, which are performed by inserting a needle in Storar’s arm, normally consist of two units of blood, which is the rough equivalent of one fifth of the total amount of blood in Storar’s system. Each transfusion takes approximately three to four hours to administer if both units are given at the same time. On some occasions, Storar has been given one unit in the evening and the second the following morning. The transfusions are painful, but not excessively so. However, because of Storar’s mounting apprehension and manifest dislike of this procedure, a nurse has been giving him a shot approximately one hour before the transfusion to settle him down.
Although he is still ambulatory and can feed himself, Storar’s physical condition has steadily deteriorated. In March, 1979, he weighed 150 pounds. In August, 1980 his weight was down to 108 pounds. He is pale, has disminished appetite and is subject to frequent attacks of nausea and emesis (vomiting). He naps frequently and spends most of his time in his room, either in bed or on the commode. Sometimes, infrequently, he sits in a chair. In contrast to his *883 behavior prior to the commencement of the transfusions, Storar now very seldom ventures outside his room. On those occasions, perhaps once or twice a week, he sits in a chair in an outside room for a maximum of two hours. He is occasionally capable of running for a short distance and each morning after breakfast walks to a shower in the hall, but sometimes has to lean on someone because of his weakness. Even after blood transfusions he remains weak.
In addition, and as a direct result of the transfusions, there is frequent clotting in Storar’s urine which makes urination quite painful. The clots increase in both size and number and he bleeds extensively after a transfusion. Each time he goes to the bathroom, the blood and clotting are present. He becomes very upset when he urinates blood, particularly because it seems that he has made a primitive connection between the blood going in and the blood coming out.
There is no question but that Storar’s illness causes him intense pain and discomfort. The physicians at the hearing were in agreement that cancer of the bladder is extremely painful. One physician described it as a “strangling pain”, characterized by frequent involuntary contractions of the bladder in an attempt to expel the cancerous mass. The pain and the need for medication increase as the cancer spreads.
At the time of the hearing, Storar was receiving medication of 50 milligrams of Demerol (a synthetic morphine substitute) and 50 milligrams of Phenergan (an antihistimine which enhances the effect of the Demerol) every four hours, intramuscularly as needed. This is in addition to his medication for asthma and epilepsy.
Storar has no comprehension of what is happening to him or the cause of his clotted, bloody urine and the frequent pain which makes him grimace and clutch at his abdomen. He has no understanding of why people periodically come to insert a needle into him and compel him to lie still for up to four hours with a needle stuck in a vein. Unquestionably this is upsetting to him and unquestionably, he does not like it. He is, beyond doubt, unable to comprehend what he is suffering from. He has no concept of death or of terminal illness. Because of his profound retardation, he is incompe *884 tent either to refuse or to consent to the continuation of the transfusions or to make a reasoned choice as to his own wishes or best interests.
The threshold question here is whether blood transfusions are ordinary or extraordinary treatments. Ordinary treatments have been defined as all medicines, treatments and operations which offer a reasonable hope of benefit and which can be obtained and used without excessive pain or other inconvenience. Extraordinary treatments, on the other hand, are those which involve excessive expense, pain or other inconvenience or, in the alternative, are those which do not offer a reasonable hope of benefit (Matter of Eichner [Fox], 73 AD2d 431, 441, n 5, supra).
Under the circumstances of this case, the blood transfusions are extraordinary treatments. They do not serve to reduce Storar’s pain; in fact, the increased amount of oxygen flowing to the brain as a result of the addition of fresh blood increases Storar’s level of sensitivity to pain. The blood forced upon him serves no curative purpose. It neither cures nor palliates his illness. Nor does it make him more comfortable; indeed, the increased blood and clotting in his urine after every transfusion contributes to his discomfort. The transfusions do not offer any hope of benefit to Storar. The blood is not being used as a treatment for Storar’s affliction, but as a tonic to replace lost fluid volume.
With or without the transfusions, Storar will die in two to six months. If the transfusions are stopped, his discomfort will not increase. As a matter of fact, the decrease in Storar’s hemoglobin level and the concomitant anemia would make him less aware of the physical sensations he is experiencing. In addition, as the volume of blood in his body decreases, his blood pressure will drop and the bleeding of the bladder lesions may well subside.
It is manifestly clear from the medical testimony that the medical profession does not believe extraordinary measures should be used if there is no hope of effecting a cure. Once such a diagnosis is clear, the current state of medical ethics dictates that the physician focus on making the patient as comfortable as possible. The physician’s efforts are thus directed at helping the patient die with dignity and comfort. *885 Medical ethics currently permit and support the termination of extraordinary means of treatment or life support systems where there is no hope of a cure and where this is the wish of the patient and his family.
Mrs. Storar, over her son’s lifetime, has come to understand his wants and needs and is acutely sensitive to his best interests. She has provided much love, personal care and affection for John, more so than any other person or institution. She has been very protective of him and consistently refers to him as her “child”. The best interests of John are of crucial importance to Mrs. Storar. She is closer to feeling what John is feeling than anyone else. In her judgment Storar does not want the transfusions continued. They are painful, they make him uncomfortable and he seems to dread them. She believes that to prolong Storar’s life does nothing but prolong his pain. She wants his suffering to stop and believes that he would want this also.
In Matter of Eichner (Fox) (supra), the court applied its substituted judgment because the patient was unable to make his own competent decision by reason of being in a vegetative coma. Similarly, the patient, Storar, in this case is incompetent to make a decision because of his own cognitive inability due to profound retardation. Accordingly, the rule in Eichner applies here as well, as does Superintendent of Belchertown State School v Saikewicz (373 Mass 728), which was cited with approval throughout Eichner.
The other procedural dissimilarity with Eichner (73 AD2d 431, supra) is also reconcilable. The holding in that case requires certification by a hospital committee of a prognosis that the patient is terminally ill and that he will never regain cognitive brain functioning. This requirement is vitiated here by virtue of the stipulation of all parties, including the hospital, that the patient is terminally ill and that his cognitive brain functioning will never improve.
Accordingly, I find that this court is within Eichner’s procedural mandates in considering the relief requested.
There is a general right, which runs to every person, competent or incompetent, to determine what will be done with his own body. Whether characterized as a common-law *886 right or as a constitutional right (see, generally, Matter of Eichner [Fox], supra; Superintendent of Belchertown State School v Saikewicz, 373 Mass 728, supra), this right yields only to “compelling State interests” of sufficient magnitude.
There are no compelling State interests in this case. The State’s interest in the preservation and sanctity of life is not involved because there is no hope of recovery. Protection of third parties is not involved because Storar . has no dependents. Prevention of suicide is not at issue because cessation of the transfusions will do no more than allow nature to run its course. Finally, maintenance of the ethical standards of the medical profession is not an issue because termination of treatments of this sort in terminal cases is consistent with and largely supported by the current state of medical ethics.
Were Storar competent, he would be entitled to cessation of the transfusions upon his request (Matter of Eichner [Fox], supra; Superintendent of Belchertown State School v Saikewicz, supra; Matter of Quinlan, 70 NJ10). But because Storar is an incompetent with an IQ of less than 20 who is incapable of expressing his wishes or making a determination as to where his own best interests lie, the court is obliged to apply its “substituted judgment” (Matter of Eichner [Fox], 73 AD2d 431, 473, supra).
On the basis of clear and convincing evidence, I concur with Mrs. Storar’s opinion that Storar’s best interests will be served by terminating the transfusions and that this would be, in fact, Storar’s preference were he able to make a decision and to articulate it.
Accordingly, the application of the respondent to discontinue the blood transfusions is granted. The application of the petitioner is denied and the prior order of this court (Curran, J.) directing continuation of the transfusions is vacated.
No participant in the treatment process, either medical or lay, shall be subject to criminal or civil liability for terminating the blood transfusions (see Matter of Eichner [Fox], supra, at p 477).
The contribution of Dr. Salvatore M. Romeo and Dr. James C. Arseneau in making their outstanding profes *887 sional judgment and experience available to the court in this proceeding is most gratefully acknowledged and deeply appreciated.