### KENNETH FOODY ET AL. *v.* MANCHESTER MEMORIAL HOSPITAL ET AL.

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE No. 291586
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed March 6, 1984

*Flaherty, Marder, Kallet & Meisler,* for the plaintiffs.

*Wiggin & Dana,* for the named defendant and the defendant Michael Gallagher.

*Richard J. Lynch,* assistant attorney general, for the defendant attorney general.

*Carl Schuman,* assistant state's attorney, for the defendant state's attorney.

M. HENNESSEY, J. In this action, the court is asked to enjoin all attending physicians and Manchester Memorial Hospital personnel from continuing the use of life-sustaining systems calculated to continue the respiration and pulse of Sandra Foody. Additionally the court is asked to declare that the discontinuance of such systems shall not subject the attending physicians and hospital personnel to civil or criminal liability.

The plaintiffs, Kenneth and Ann Foody, are the parents of Sandra Foody. The plaintiff, Kenneth Foody, is the conservator of the person of Sandra Foody. Sandra Foody is a forty-two year old patient at Manchester Memorial Hospital. On December 15, 1983, Sandra Foody suffered a respiratory arrest resulting in severe hypothermia. She was taken by ambulance to the emergency room of the hospital where she was successfully resuscitated and intubated. She was admitted and placed on a respirator. She is semicomatose, unable to breathe without the respirator. The requested relief will, according to the medical testimony, have a determinative effect upon the life of Sandra Foody; it will, with reasonable certainty, result in her death within a matter of minutes.

This matter comes before the court by way of a hearing on the plaintiffs' complaint on February 21, 1984. The named defendants are the Manchester Memorial Hospital, its acting executive director, Sandra Foody's attending physician, the attorney general for the state of Connecticut, the state's attorney's office and Sandra Foody's guardian ad litem. The hearing covers both the temporary and permanent injunctive relief sought

with the higher standard for the issuance of a permanent injunction governing the court in its determination.

On the basis of the evidence presented in this case, the court makes the following findings concerning Sandra Foody's medical condition. For the past twenty-four years Sandra Foody has been diagnosed as suffering from multiple sclerosis. During that period the disease has become progressively severe, and there have been no extended periods of remission. Her condition has steadily declined, and she has not been spared by the plateaus sometimes associated with multiple sclerosis. Her balance and vision were first affected. Eventually she was confined to her bed or wheelchair. She lost control over her motor functions and she has been declared legally blind. By December of 1983, Sandra could not sit up on her own, nor hold her head up. She could not speak so that others could understand. She could swallow, and showed response to noise. By December 15, 1983 her breathing became heavy and she had been yawning increasingly. On that day she developed respiratory arrest, became cyanotic and was unable to breathe on her own. Her father dialed the local emergency number after unsuccessfully trying to reach the family physician. A policeman arrived and administered mouth to mouth resuscitation prior to the arrival of the ambulance. She was rushed to Manchester Memorial Hospital emergency room where she was successfully resuscitated and intubated by the hospital staff. After admission she was placed on a respirator. A tracheostomy was performed to avoid trachea collapse. A tube was placed through the opening formed by the tracheostomy which was attached to the respirator. The body's reaction to the tube was an increase in secretions which the force of the respirator caused to enter the lungs. These secretions must be removed

from Sandra's lungs by suction catheter at least three to four times per nursing shift. She receives nutrients through a nasogastric tube.

Sandra's condition is stable. She is semicomatose. Attempts to trigger a breathing reflex have failed. She must be turned by the hospital staff to prevent the development of sores, and each time she is turned the respirator must be shut off. An electroencephalogram taken on February 17, 1984 indicates the presence of brain waves but the results are very abnormal. It is thought that only her brain stem is functional. The brain stem controls the heartbeat, body temperature and some reflexive action. Her gag and grimace reflexes are present but her deep tendon reflexes and plantar responses are absent. Her pupils are only sluggishly reactive to light. Her gaze is fixed downward and to the right with some change as the head is rotated. She has perceived sleep patterns. She cannot see and it is believed that she cannot hear. Her eyes blink randomly and involuntarily. Tests show that she has no pain response. In all medical probability she has no cognitive function, i.e., her brain is incapable of synthesizing and understanding outside stimuli. Her condition is best described as awake but unaware. Her semicomatose state is not believed to be attributable to multiple sclerosis, but to an aspiration while eating, which produced acute respiratory arrest, causing insufficient oxygen to the brain.

Having shown no sign of improvement after two months of treatment, Sandra's condition is considered to be permanent and irreversible. Generally, recovery of consciousness is very unlikely for patients with hypoxia who remain comatose or in a persistent vegetative state for more than one month. See "Deciding to Forego Life-Sustaining Treatment, Ethical, Medical, and Legal Issues in Treatment Decisions," President's Commission for the Study of Ethical Problems in Medi-

cine and Biomedical and Behavioral Research, March, 1983, Pr 40.8:Et 3/L 62/2, pp. 178–79 (hereinafter Commission Report). No diagnostic or therapeutic interventions are viewed as appropriate. The prognosis for improvement is considered hopeless. Sandra will require long-term care in a chronic care facility, connected to a respirator for the rest of her life. It is estimated that should the respirator be disconnected, brain death would occur after approximately ten minutes.

In addition to medical evidence, testimony was offered on the quality of Sandra's lifestyle prior to her being stricken with multiple sclerosis and the high degree of quality care which she received at home from her parents after the onset of the disease. Prior to her illness, Sandra was active in high school, playing in the school orchestra and working on the school newspaper. She was involved in scouting and church activities. After graduation she enrolled at Central Connecticut State College but withdrew after one semester because of her worsening health condition. After her eyesight failed she enjoyed talking book recordings and listening to the radio. During all the years of her confinement with multiple sclerosis, she rarely cried and was known by her parents to have only once verbalized a complaint, stating: "I have eyes but cannot see, I have legs but cannot walk." At no time has Sandra expressed an opinion on the use of extraordinary life-support systems on patients with no reasonable hope of recovery.

Finally, it is notable that Sandra Foody has no material estate. Her medical expenses are borne by insurance and by Title XIX. The coverage will not be exhausted. Her family, therefore, has no financial interest in the outcome of this proceeding.

The plaintiffs urge the court to authorize "the discontinuance of the extraordinary means being used"

to maintain Sandra Foody's life. The legal basis offered for this request is the right to bodily self-determination.

The right to privacy, though not explicitly provided for in the constitution, arises from penumbras of specific guarantees in the bill of rights, specifically the first, third, fourth, fifth and ninth amendments. *Griswold* v. *Connecticut,* 381 U.S. 479, 484–85, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965). The constitutional right to privacy has been extended to include the right of the individual to be free from unwarranted governmental intrusion into matters affecting a person's fundamental rights. *Eisenstadt* v. *Baird,* 405 U.S. 438, 453, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972). It encompasses the right of a patient to be free from unwanted infringements of bodily integrity, including medical treatment, in appropriate circumstances. *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728, 739, 370 N.E.2d 417 (1977); *In re Quinlan,* 70 N.J. 10, 40, 355 A.2d 647, cert. denied sub nom. *Garger* v. *New Jersey,* 429 U.S. 922, 97 S. Ct. 319, 50 L. Ed. 2d 289 (1976).

Apart from constitutional considerations, the individual right to self-determination has long been recognized at common law. In *Union Pacific Ry. Co.* v. *Botsford,* 141 U.S. 250, 251, 11 S. Ct. 1000, 35 L. Ed. 734 (1891), the court stated that "[n]o [legal] right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." The right of one's person is a right of complete immunity to be let alone. Id., 251–52. This right includes the right of a competent adult to refuse life-sustaining medical treatment. *Matter of Fox,* 102 Misc. 2d 184, 203, 423 N.Y.S.2d 580 (1979), modified and aff'd sub nom., *Matter of Eichner (Fox),* 73 App. Div. 2d 431, 426 N.Y.S.2d 517 (1980),

modified, 52 N.Y.2d 363, 438 N.Y.S.2d 266 (1981); *Erickson* v. *Dilgard,* 44 Misc. 2d 27, 252 N.Y.S.2d 705 (1962); *In re Quackenbush,* 156 N.J. Super. 282, 383 A.2d 785 (1978).

Ordinarily a person may assert only his own constitutional rights. *Bell* v. *Planning & Zoning Commission,* 174 Conn. 493, 499, 391 A.2d 154 (1978). The courts have recognized the right of a guardian of the person to vicariously assert the right of an incompetent or unconscious ward to accept or deny medical care. *Severns* v. *Wilmington Medical Center, Inc.,* 421 A.2d 1334, 1347 (Del. 1980); *Matter of Spring,* 380 Mass. 629, 635, 405 N.E.2d 115 (1980); *In re Quinlan,* supra, 41–42; *Leach* v. *Akron General Medical Center,* 68 Ohio Misc. 1, 426 N.E.2d 809 (1980). To deny the exercise because the patient is unconscious or incompetent would be to deny the right. *Severns* v. *Wilmington Medical Center,* supra, 1347. It is incumbent upon the state to afford an incompetent the same panoply of rights and choices it recognizes in competent persons. *Superintendent of Belchertown State School* v. *Saikewicz,* supra, 742. In the present case the court finds that Kenneth Foody has standing to maintain this action as conservator of the person of Sandra Foody.

The right of an individual to refuse medical treatment is subject to being overridden by state interests in appropriate circumstances. Id., *Matter of Fox,* supra, 203. Countervailing state interests include the preservation of life, the protection of the interests of innocent third persons, the prevention of suicide, and maintenance of the ethical integrity of the medical profession. *Leach* v. *Akron Medical Center,* supra; *Superintendent of Belchertown State School* v. *Saikewicz,* supra, 740–41.

The state has a legitimate interest in the preservation of human life. Id. This interest has justified court-ordered medical intervention where routine medical

treatment would likely allow an otherwise dying patient to lead a relatively normal, healthy life. *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 399 N.E.2d 452 (1979) (dialysis); *Application of President & Directors of Georgetown College,* 331 F.2d 1000 (D.C. Cir.), cert. denied sub nom. *Jones* v. *President & Directors of Georgetown College,* 377 U.S. 978, 84 S. Ct. 1883, 12 L. Ed. 2d 746 (1964) (blood transfusion); *John F. Kennedy Memorial Hospital* v. *Heston,* 58 N.J. 576, 279 A.2d 670 (1971) (blood transfusion). The state's interest in preserving life weakens and the individual's right of privacy grows as the degree of bodily invasion necessary for treatment increases and the prognosis dims. *In re Quackenbush,* supra, 290. As the *Saikewicz* court aptly noted, the interest of the state in prolonging a life must be reconciled with the interest of an individual in rejecting the traumatic cost of that prolongation. *Superintendent of Belchertown State School* v. *Saikewicz,* supra, 742. "There is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether, but when, for how long, and at what cost to the individual that life may be briefly extended." Id.

The decisions generally frame the state's interest as being determined by the patient's prognosis, while the nature of the treatment defines the patient's interest. See *In re Conroy,* 190 N.J. Super. 453, 464 A.2d 303 (1983). In determining the patient's interest, not only should the nature of the treatment be considered, but the usefulness or benefits of the treatment as well. Whether serious burdens of treatment are worth enduring should depend upon how long the treatment will extend life and under what conditions.

In the present case, Sandra Foody's prognosis is extremely poor; she is never expected to resume cognitive, sapient life, and her physical condition, due to

multiple sclerosis, continues to deteriorate. The degree of bodily invasion is great; she requires around the clock nursing care, drugs to control brain seizures, the assistance of a respirator, a lung cleaning suction catheter and a nasogastric feeding tube. To recognize the patient's right to decide to terminate an artificial life-sustaining treatment in these narrow and extreme circumstances would not undermine the state's interest in the preservation of life.

The next state interest requiring discussion is that of the maintenance of the ethical integrity of the medical profession. The decision whether to discontinue life-sustaining measures has traditionally been expressed by the distinction between ordinary and extraordinary treatment. *In re Conroy,* supra, 470. Under the distinction, ordinary care is obligatory for the patient to accept and the doctor to provide, and extraordinary care is optional. Commission Report, p. 82, citing McCartney, note, 47 Linacre Q. 215 (1980). The standard definition of the terms is as follows. "Ordinary means are all medicines, treatments and operations which offer a reasonable hope of benefit and which can be obtained and used without excessive expense, pain or other inconvenience. Extraordinary means are all medicines, treatments and operations which cannot be obtained or used without excessive expense, pain or other inconvenience, or if used, would not offer a reasonable hope of benefit." Kelly, Medico-Moral Problems, p. 129 (1959).

It is clear from the testimony that when Sandra Foody was brought into the emergency room, the use of a respirator was ethically required. She was in a state of respiratory attack, and physically unable to consent to the treatment. Her legal conservator had not yet arrived on the scene, and time was of the essence. The physicians' primary concern was to stabilize the

patient's condition. At the time she came in, the physicians could not rule out improvement in her condition.

The issue which must be resolved is whether prevailing medical ethics require the continuation of a life-sustaining measure in light of a significant downgrading of a patient's prognosis from the time of initiation of the treatment. The medical profession has devised clinical criteria for the determination of "brain death." See Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death, "A Definition of Irreversible Coma," 205 J.A.M.A. 377 (1968). When permanently unconscious patients do not meet the stated criteria, however, difficult questions are raised about the type and extent of care that should be provided.

Viewing the obligation to provide treatment as based upon whether the treatment offers reasonable hope of benefit to the patient, withdrawal of treatment should be ethically permissible where it no longer offers hope of benefit to the patient. Commission Report, pp. 74–77. The commission warns that requiring a higher justification for stopping treatment than for starting it will have serious adverse consequences, among which is the possibility that potentially life-saving treatment will not be started because of fear on the part of health care personnel that once started, it will be difficult to stop if it proves of little benefit, but a great burden, to the patient. Id., 75.

That a patient may choose to have treatment withdrawn is compatible with the ethical mores which allow a competent patient, or his family if he is incompetent, to consent to the entry of a "DNR" (do not resuscitate) order on a patient's chart. The DNR order is based upon the philosophy that a person capable of giving informed consent has the right to make his own decision regarding medical care. Id., 240; see "Guidelines

for Discontinuance of Cardiopulmonary Life-Support Systems under Specified Circumstances," adopted by the Los Angeles County Medical and Bar Association, reprinted in Commission Report, pp. 461–62.

In the present case, Sandra Foody's attending physician considers the use of the respirator an extraordinary measure, and notes that even with its use, the quality of her life is very poor. Consulting physicians are unable to recommend any diagnostic or therapeutic treatments which might improve her condition. Prevailing medical ethical practice does not, without exception, demand that all efforts toward life prolongation be made in all circumstances. Rather, as the courts in *Quinlan* and *Saikewicz* indicate, prevailing ethical practice seems to recognize that the dying are more in need of comfort than of treatment. The right to refuse treatment in appropriate circumstances is consistent with existing medical mores. The court finds that the present case presents appropriate circumstances for the exercise of that right.

The state interest in preventing suicide requires little discussion. An individual's determination to cease medical treatment pursuant to his right of privacy does not constitute suicide. *In re Quinlan,* supra, 51–52. This is so, because (1) in refusing treatment the patient may not have the specific intent to die, and (2) even if he did, to the extent that death resulted from natural causes, the patient did not set the death producing agent in motion with intent to cause his own death. *Superintendent of Belchertown State School* v. *Saikewicz,* supra, 743 n.11.

The final state interest which must be considered is that of protecting innocent third persons. In the present case, Sandra Foody has no children who might suffer emotionally or materially from the decision to withdraw life-sustaining systems. Nor, therefore, does

the state have a parens patriae interest toward any potential wards. The court finds that the interest of third parties in this case is either minimal or nonexistent and must be outweighed by the incompetent's right in question.

On the basis of the above analysis, the court concludes that no state interest exists to the degree necessary to outweigh the right of Sandra Foody to exercise her right to refuse further life-sustaining treatment.

Having ascertained the existence of a right on the part of the semicomatose Sandra Foody to refuse further life-sustaining measures, the question is how that right may best be exercised. The *Quinlan* court noted that "[c]ourts in the exercise of their parens patriae responsibility to protect those under disability have sometimes implemented medical decisions and authorized their carrying out under the doctrine of 'substituted judgment.' *Hart* v. *Brown,* 29 Conn. Sup. 368 [370, 289 A.2d 386 (1972)]." *In re Quinlan,* supra, 44. The *Quinlan* court authorized "the guardian and family of Karen [Quinlan] to render their best judgment, subject to [consultation with attending physicians and ethics committee] as to whether she would exercise [the right] in these circumstances." Id., 41. The rationale for this authorization was that an overwhelming majority of society would, "in similar circumstances, exercise such a choice in the same way for themselves or for those closest to them." Id., 41–42. The Massachusetts courts have adopted a similar standard. *Superintendent of Belchertown State School* v. *Saikewicz,* supra; *Matter of Spring.* The primary test in the substituted judgment standard is subjective, i.e., to determine with as much accuracy as possible the wants and needs of the incompetent individual, not necessarily what may conform to what the majority deem wise or prudent. *Superintendent of Belchertown State School* v. *Saikewicz,* supra, 750–51. An expression of intent

while competent is not essential, the opinion may be based upon knowledge of the individual gleaned from a family relationship. Id.; *Matter of Spring,* supra, 640. The decision should be "that which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person." *Superintendent of Belchertown State School* v. *Saikewicz,* supra, 752–53.

The analyses of the *Saikewicz* and *Quinlan* courts have been criticized for basing their decisions on what a majority would do in similar circumstances where there was in fact no evidence as to what the individual's choice would be. *Matter of Fox,* supra, 209–10. The *Fox* court believed that the result of both decisions was to permit a choice to be made for one person by another, not necessarily reflecting what the decision of the incompetent would have been. Id. On review, the Appellate Division of the New York Supreme Court adopted the substituted judgment test where a patient has not made his views known while competent. *Matter of Eichner (Fox),* supra, 473.

If the exercise of the right is to be maintained where no expression has been made by an incompetent patient as to treatment, it must take place within the context of an analysis which seeks to implement what is in that person's best interests by reference to objective societally shared criteria. See Commission Report, pp. 134–35. "In assessing whether a procedure or course of treatment would be in a patient's best interests, the decision maker must take into account such factors as the relief of suffering, the preservation or restoration of functioning, and the quality as well as extent of life sustained." Commission Report, p. 135.

Although Sandra Foody never expressed her view on whether she would want to be kept alive under the present circumstances, the evidence depicts her as an individual who was resigned to the acceptance of her affliction with multiple sclerosis and its inevitable consequences. Those consequences, i.e., debilitation and eventual death, do not appear to include life on the respirator on which she now depends. The treatment involved, while unquestionably extending her life, offers no hope for the future. In the words of the attending physician, Sandra Foody can in no way interact with her environment. Where the incapable patient's condition (1) is permanent and irreversible and there is no reasonable medical probability that the patient ever will return to a cognitive state, (2) the patient's attending physician together with at least two other consulting physicians unanimously concur as to the patient's condition, and (3) there are concerned family members who in good faith wish to exercise through substitute decision-making the patient's right to discontinue artificial life-support systems, it is our conclusion that the family lawfully may act as the patient's substitute decision-maker and may decide to discontinue the use of the respirator and we so hold.

The defendants Manchester Memorial Hospital, its executive director, and the attending physician having stated they would comply with the court's ruling, the plaintiffs do not press their request for injunctive relief. The court finds, however, that the plaintiffs have carried their burden for permanent injunctive relief in the present case and would be prepared to act on that request if the need arises.

Accordingly, it is this court's ruling that Sandra Foody's family, Kenneth and Ann Foody, may act as Sandra's substitute decision-maker, and may decide to discontinue the use of all artificial devices calculated or intended to continue Sandra's respiration and pulse.

If the decision is made to discontinue the use of all such devices and as a result death should occur, hospital personnel and attending physicians shall not be subject to criminal or civil liability because of such discontinuance.