741 P.2d 667

Mildred RASMUSSEN by Douglas P.
MITCHELL, her Guardian ad
Litem, Appellant,

v.

Robert FLEMING, Pima County Public
Fiduciary, as Guardian for Mildred
Rasmussen, Appellee.

No. 2 CA–CIV 5622.

Court of Appeals of Arizona,
Division 2, Department A.

June 25, 1986.

Douglas P. Mitchell, Tucson, pro se.

Robert B. Fleming, Former Pima County Public Fiduciary, Kate McMillan, Pima County Public Fiduciary by Alyce Pennington, Tucson, for appellee.

Fenella Rouse, Staff Atty., New York City, for amicus curiae Soc. for Right to Die, Inc.

## OPINION

HOWARD, Presiding Judge.

This appeal arises out of a determination by the lower court that the guardian of an incapacitated person has the authority to refuse medical care for his or her ward.

While this case was on appeal, Mildred Rasmussen died of complications following pneumonia. It is within our discretion to decide questions which have become moot. *Miceli v. Industrial Commission of Arizona*, 135 Ariz. 71, 659 P.2d 30 (1983). The issues presented here are of great importance to legal practitioners, families, guardians, doctors, hospitals and nursing home staff who face similar situations on a daily basis; therefore, we retain the matter for decision.

Mildred Rasmussen is now deceased, but we mention the facts of her condition to give perspective to the problems faced by those who are involved in making life and death decisions for an incapacitated person.

Mildred Rasmussen was a 70 year-old county care patient who had been residing at the Posada Del Sol Nursing Home in Tucson, Arizona, for about six years. Prior to admission at Posada Del Sol, Rasmussen had led an independent life and had practiced as a chiropractor in Tucson. She had two brothers and one sister, all of whom resided in Iowa, but no other immediate family. She had been diagnosed as suffering from three strokes, a degenerative neural muscular disease, and/or an organic brain syndrome. Her mental and physical condition deteriorated during her stay at Posada Del Sol Nursing Home to the extent that she was sustained through a nasal gastric tube which was in place for two and one-half years and was removed only prior to the filing of the petition for appointment of a guardian in this case.

Rasmussen became unable to care for herself and spent all of her time in bed in a curled-up position. Her basic care was provided by nurses who administered medication and turned her from side to side on a regular basis to avoid development of bed sores. She was fed by a syringe and was able to swallow liquids on her own.

The testimony regarding Rasmussen's ability to understand and communicate was inconsistent. Her treating physician and an independent neurologist testified that she was unable to comprehend and respond to external stimuli in a meaningful way and was unable to communicate. On the other

hand, both her treating nurses and the patient advocate/friend treated Rasmussen as if she could respond to external stimuli such as the radio that was in her room. They spoke to her and observed her pained responses to the insertion of a nasal gastric tube. Some of the witnesses testified that those types of responses are basic physiological responses that have no directive or cognizant origin. All the physicians agreed that her condition was incurable and irreversible and that there was no reasonable possibility that she would return to a cognitive sapient state.

During the pendency of this appeal, Rasmussen's medical chart at Posada Del Sol had "do not resuscitate" (DNR), and "do not hospitalize" (DNH) orders placed on it. The DNR order was a directive that she not be resuscitated should she suffer from cardiac arrest or a similar condition. The DNH order was intended to prevent immediate and presumptive hospitalization for medical treatment. Medical personnel would only provide comfort care and the absence of extreme medical intervention would allow certain diseases such as gangrene, pneumonia, or urinary tract infections to take their normal course and eventually kill the patient. Those orders were placed on Rasmussen's medical chart by the treating physician after consideration of her medical diagnosis and prognosis.

Rasmussen was unable to communicate her thoughts concerning the propriety of continued medical treatment. There was no evidence that she ever communicated her desires to others with regard to maintaining her life through extraordinary medical care measures. Although the family members were not actively involved in Rasmussen's medical treatment, after consultation, they were willing to abide by the decision of the treating physician to place the DNR and DNH orders.

The Pima County Public Fiduciary had served as guardian for Rasmussen from May 8, 1979, until July 27, 1982, when the guardianship was terminated. On May 29, 1985, the Pima County Public Fiduciary again petitioned for appointment as guardian for the purpose of consenting to the removal of the nasal gastric tube which was sustaining Rasmussen's life.

A guardian ad litem was appointed and the immediate family members were notified. The guardian ad litem was informed that Rasmussen had been taught to ingest food on her own but that there still were DNR and DNH orders on her medical chart. The guardian ad litem objected to the appointment of the public fiduciary or any other guardian unless there was an affirmative order that the guardian remove the DNH and DNR orders from the medical chart. Both the guardian and the guardian ad litem stipulated to the fact that Rasmussen was incapacitated. After a two-day evidentiary hearing, the court, on October 29, 1985, appointed the Pima County Public Fiduciary's Office as guardian without restriction. The court made extensive findings of fact and specifically found that a Title 14 guardian has the authority to withhold medical care from his or her ward. As a result, this appeal ensued.

The legal issues which we will consider are: (1) Is the Medical Treatment Decision Act, A.R.S. §§ 36–3201 to 3210, applicable in this case? (2) Does the constitutional right of privacy extend to the withdrawal or withholding of life-sustaining medical treatment? (3) Do any of the competing state interests outweigh this right of privacy? (4) May the constitutional rights of the incompetent be asserted vicariously? (5) What is the proper procedure for either the court or guardian to withhold or withdraw medical treatment from a ward? (6) What are the appropriate factors for the court and/or guardian to consider in restricting medical care?

## MEDICAL TREATMENT DECISION ACT

■ Appellant argues that the Medical Treatment Decision Act, A.R.S. §§ 36–3201 to 3210, controls and prohibits the relief sought: removal of Rasmussen's nasal gastric tube and approval of the DNR and DNH orders on Rasmussen's medical chart. The Act provides that a person may direct, in advance, that life sustaining procedures, which serve only to "prolong the dying

process," may be withheld should the person suffer from a terminal illness. A.R.S. § 36–3201(4). The Act does not apply here since there was no advance consent by Rasmussen and she was not terminally ill. Furthermore, the Act merely supplements a person's constitutional right to refuse treatment, and defines a convenient form to consent in advance so as to avoid any complications or delays which might arise absent such consent.

### RIGHT OF PRIVACY

The right of a competent adult to refuse medical treatment has its origins in the constitutional right of privacy. *In Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) the court held that the application of Connecticut statutes which prohibited the use of contraceptive devices by married persons violated the due process clause because they invaded marital "privacy." The majority opinion by Justice Douglas found that the "penumbras" of the several guarantees of the Bill of Rights established this right of privacy. Justice Harlan concurred, finding that the due process clause protected fundamental liberties which were not specifically expressed in the Bill of Rights.

*In Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court overturned a Texas statute which proscribed procuring or attempting the abortion of a fetus except when necessary to save the life of the mother. The court held that the statute violated the due process clause of the Fourteenth Amendment in that it unnecessarily infringed on a woman's right to privacy. In conjunction with *Roe v. Wade,* supra, in *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the court invalidated a number of statutory procedural restrictions placed on a woman's ability to secure an abortion, and held that the provisions unnecessarily restricted a woman's right to privacy and therefore violated due process. In a concurring opinion, Justice Douglas stated that "freedom to care for one's health and person" is part of the right of privacy. *Doe v. Bolton,* 410 U.S. at 213, 93 S.Ct. at 758.

Finally, perhaps the most significant attempt of the Supreme Court to define the constitutional right of privacy came in *Whalen v. Roe,* 429 U.S. 589, 598–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64, 73 (1977). The court stated:

"The cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions."

■ Although the constitution does not explicitly mention a right of privacy, Supreme Court decisions have recognized that a right of personal privacy exists and that certain areas of privacy are guaranteed under the constitution. *Matter of Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976), cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). See *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). Although the United States Supreme Court has not addressed the precise issue of whether the right of privacy includes the right to refuse medical treatment, several states have held that such a constitutional right exists. *Bouvia v. Superior Court,* 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (1986); *Bartling v. Superior Court,* 163 Cal.App.3d 186, 209 Cal.Rptr. 220 (1984); *Foody v. Manchester Memorial Hospital,* 40 Conn.Sup. 127, 482 A.2d 713 (Super.Ct.1984); *Severns v. Wilmington Medical Center Incorporated,* 421 A.2d 1334 (Del.1980); *Guardianship of Barry,* 445 So.2d 365 (Fla.App.2d 1984); *Satz v. Perlmutter,* 362 So.2d 160 (Fla. App.1978), approved by *Satz v. Perlmutter,* 379 So.2d 359 (Fla.1980); *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); *Guardianship of Roe,* 383 Mass. 415, 421 N.E.2d 40 (1981); *Matter of Spring,* 380 Mass. 629, 405 N.E.2d 115 (1980); *Conservatorship of Torres,* 357 N.W.2d 332 (Minn.1984); *Matter of Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985);

*Matter of Quinlan*, supra; *Leach v. Akron General Medical Center*, 68 Ohio Misc. 1, 426 N.E.2d 809 (1980); *Guardianship of Ingram*, 102 Wash.2d 827, 689 P.2d 1363 (1984); *Welfare of Colyer*, 99 Wash.2d 114, 660 P.2d 738 (1983). We agree with the reasoning of those courts and hold that the right to refuse medical treatment is based upon the constitutional right of privacy. The right of privacy is protected by both the federal constitution and the Arizona Constitution. Ariz. Const. Art. 2, § 8.

## COMPETING STATE INTEREST

■ Next we must decide whether any of the competing state interests outweigh the constitutionally protected right to refuse treatment. See, *Youngberg v. Romeo*, 457 U.S. 307, 319–320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28, 39–40 (1982); *Bell v. Wolfish*, 441 U.S. 520, 560, 99 S.Ct. 1861, 1885, 60 L.Ed.2d 447, 482 (1979); *Roe v. Wade*, supra, 410 U.S. at 153–154, 93 S.Ct. at 727, 35 L.Ed.2d at 177; *Jacobson v. Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905). The right to refuse treatment is not absolute. It must be weighed against the following state interests: (1) preservation of life; (2) protection of the interests of innocent third parties; (3) prevention of suicide; and (4) maintenance of the ethical integrity of the medical profession. *Superintendent of Belchertown State School v. Saikewicz*, supra, 370 N.E.2d at 425. The lower court in this case did not base its decision on the constitutional right of privacy. For illustrative purposes only, we will utilize the facts of this case and decide whether the competing state interests outweigh the constitutional right of privacy.

Clearly, the most significant state interest is the preservation of human life. We agree with the *Quinlan* court that "the State's interest contra weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims." *Matter of Quinlan*, supra, 70 N.J. at 41, 355 A.2d at 664. Similarly, the *Saikewicz* court discussed the relationship between an individual's right of privacy and the state's interest in preservation of life as follows:

"The interest of the State in prolonging a life must be reconciled with the interest of an individual to reject the traumatic cost of that prolongation. There is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether but when, for how long, and at what cost to the individual that life may be briefly extended." 370 N.E.2d at 425–26.

■ The medical evidence before the court established that there was "zero" hope of Rasmussen ever returning to a cognitive state. It also established that Rasmussen was in pain and thrashed about when the nasal gastric tube was inserted. Furthermore, there was no indication that Rasmussen's condition was curable or would improve with treatment; the treatment she received merely sustained the status quo. Based on these facts a court could conclude that Rasmussen's privacy right to refuse treatment outweighed the state's interest in preservation of life.

The other state interests do not mandate a different conclusion. Rasmussen had no children and her remaining family, two brothers and a sister from out of state, agreed to abide by the physician's decision. Thus, no third party interest needed to be protected. *Welfare of Colyer*, supra.

Prevention of suicide is also an inapplicable consideration in the case sub judice. "A death which occurs after the removal of life sustaining systems is from natural causes, neither set in motion nor intended by the patient." *Welfare of Colyer*, 660 P.2d at 743. See also, *Superintendent of Belchertown State School v. Saikewicz*, supra.

■ Finally, the medical profession's ethical integrity is enhanced by allowing, in appropriate cases, the removal or withholding of life-prolonging medical treatment. The American Medical Association's Council on Ethical and Judicial Affairs adopted the following statement on March 15, 1986,

entitled "Withholding or Withdrawing Life-Prolonging Medical Treatment:"

"The social commitment of the physician is to sustain life and relieve suffering. Where the performance of one duty conflicts with the other, the choice of the patient, or his family or legal representative if the patient is incompetent to act in his own behalf, should prevail. In the absence of the patient's choice or an authorized proxy, the physician must act in the best interest of the patient.

For humane reasons, with informed consent, a physician may do what is medically necessary to alleviate severe pain, or cease or omit treatment to permit a terminally ill patient whose death is imminent to die. However, he should not intentionally cause death. In deciding whether the administration of potentially life-prolonging medical treatment is in the best interest of the patient who is incompetent to act in his own behalf, the physician should determine what the possibility is for extending life under humane and comfortable conditions and what are the prior expressed wishes of the patient and attitudes of the family or those who have responsibility for the custody of the patient.

*Even if death is not imminent but a patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis and with the concurrence of those who have responsibility for the care of the patient, it is not unethical to discontinue all means of life-prolonging medical treatment.*

Life-prolonging medical treatment includes medication and artificially or technologically supplied respiration, nutrition or hydration. In treating a terminally ill or irreversibly comatose patient, the physician should determine whether the benefits of treatment outweigh its burdens. At all times, the dignity of the patient should be maintained." (Emphasis added.)

Finding no state interest sufficient to counterbalance Rasmussen's right of privacy, the court could have concluded that the removal of the nasal gastric tube and placement of the DNH and DNR orders on her medical chart were appropriate.

## JUS TERTII

■ We must decide who may exercise this constitutional right to refuse treatment. Clearly, a competent patient may exercise the right on his or her own behalf or may provide in advance of incompetency what should be done. In this case, we are faced with the question of whether someone other than the patient may assert the patient's right to refuse treatment if the patient has not done so and is unable to communicate his or her desires. In cases permitting the assertion of constitutional rights of one by another, the Supreme Court has noted three considerations: (1) presence of some substantial relationship between the claimant and the third party; (2) impossibility of the rightholder's assertion of the constitutional rights; and (3) need to avoid a dilution of the rightholder's constitutional rights that would result if the assertion of jus tertii were not permitted. *Eisenstadt v. Baird,* supra, 405 U.S. at 445, 92 S.Ct. at 1034, 31 L.Ed.2d at 358; *Griswold v. Connecticut,* supra 381 U.S. at 481, 85 S.Ct. at 1680, 14 L.Ed.2d at 513; *N.A.A.C.P. v. Alabama ex rel. Patterson,* 357 U.S. 449, 458–59, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488, 1497–98 (1958).

■ We find that either a family member or guardian may assert the constitutional rights of the patient to refuse medical treatment. The Court's three-prong test is easily met in these types of cases. Certainly a family member or guardian stands in some "substantial relationship" to the patient. Furthermore, an incompetent person is incapable of asserting his constitutional rights and those rights will be diluted if not asserted. Other courts have also found that an incompetent should not lose his right to refuse treatment by virtue of his incompetency. As the *Saikewicz* court noted:

"The recognition of that [privacy] right must extend to the case of an incompetent, as well as a competent, patient because the value of human dignity ex-

tends to both." 373 Mass. at 745, 370 N.E.2d at 427.

See also, *Severns v. Wilmington Medical Center Incorporated*, supra; *John F. Kennedy Memorial Hospital, Inc. v. Bludworth*, 452 So.2d 921 (Fla.1984); *In re P.V.W.*, 424 So.2d 1015 (La.1982); *Matter of Spring*, supra; *Matter of Quinlan*, supra; *Leach v. Akron General Medical Center*, supra; *Guardianship of Ingram*, supra; *Guardianship of Hamlin*, 102 Wash.2d 810, 689 P.2d 1372 (1984); *Welfare of Colyer*, supra.

## PROCEDURAL SAFEGUARDS

The public fiduciary petitioned the court to become Rasmussen's guardian in order to consent to placement of the DNR and DNH orders and removal of the nasal gastric tube. Appellant contends that the trial court erred when it appointed the Pima County Public Fiduciary's Office as guardian of Rasmussen, *without any specific instructions or restrictions*. We disagree.

There was conflicting testimony as to whether or not Rasmussen possessed any cognitive abilities. Based on the record, we must conclude that the trial judge, after hearing the evidence presented by both parties, resolved the conflict in favor of the petitioning guardian's position since she ordered that the petitioning guardian be given authority to make the decision.

■ In the future, however, to minimize the amount of judicial intervention in these cases, and in the absence of any legislation on the subject in Arizona,[1] we believe the following procedures should be followed when making such decisions:[2] If a person is comatose and there is no reasonable possibility that he will return to a cognitive sapient state, and if it is determined by the attending physician that the person's present condition is incurable, irreversible and there is confirmation of the person's present condition by two other physicians who have been consulted on the matter, and if a vital function of the person is being sustained by extraordinary[3] means; then, extraordinary means may be discontinued upon the direction and under the supervision of the attending physician at the request of any of the individuals in the following order of priority: (1) The judicially appointed guardian of the person of the patient if such guardian has been appointed. This should not be construed to require such appointment before a treatment decision can be made. (2) The person or persons designated by the patient in writing to make the treatment decision for him. (3) The patient's spouse. (4) An adult child of the patient or, if the patient has more than one adult child, a majority of the adult children who are reasonably available for consultation. (5) The parents of the patient. (6) The nearest living relative of the patient. (7) If none of the above are available, then at the discretion of the attending physician, the extraordinary means may be discontinued upon the direction and under the supervision of the attending physician.[4]

## FACTORS IN MEDICAL TREATMENT DECISIONS

■ The trial court in this case adopted the "best interests" doctrine and directed that it be employed to guide the guardian's decision. We agree that this is the appropriate standard to apply in cases of incompetent patients who have never voiced their desires regarding life-sustaining extraordinary medical procedures. When a patient's likely decision with regard to medical treat-

---

1. Although it is preferable for the legislature to provide guidelines in this complex area, in the absence of such legislation, we believe it is the court's responsibility to develop such guidelines to aid those seeking to assert their constitutional rights. See, *Satz v. Perlmutter*, supra, 379 So.2d at 360–61; *Matter of Conroy*, supra, 486 A.2d at 1221.

2. We have extensively plagiarized Florida's Life-Prolonging Procedure Act, Fla.Stat., Chap. 84–58, § 765.07 (1984) and North Carolina's Right to Natural Death Act, N.C.Gen.Stat. § 90–322 (1983).

3. Extraordinary medical treatment includes medication and artificially or technologically supplied respiration, nutrition or hydration.

4. We have purposefully omitted any requirement that the person's condition be terminal to conform with the statement adopted by the American Medical Association, and quoted in our opinion above.

ment is unknown, the "surrogate decision-maker should use the best interests standard and choose a course that will promote the patient's well-being as it would probably be conceived by a reasonable person in the patient's circumstances." President's Commission For The Study Of Ethical Problems In Medicine And Biomedical And Behavioral Research, *Deciding to Forego Life-Sustaining Treatment,* p. 136 (1983). See also, *Barber v. Superior Court,* 147 Cal.App.3d 1006, 195 Cal.Rptr. 484 (1983). With this standard in mind, the guardian should consider the following factors outlined by the Washington Supreme Court in *Guardianship of Ingram,* supra, 689 P.2d at 1370, when making medical treatment decisions for a ward. This list is not intended to be exhaustive but would include:

"[T]he ward's prognosis if she chose no treatment; the prognosis if she chose one treatment over another; the risk of adverse side effects from the proposed treatments; the intrusiveness or severity of the proposed treatments; the ability of the ward to cooperate and assist with post-treatment therapy; the ward's religious or moral views regarding medical care or the dying process; and the wishes of family and friends, if those wishes would influence the ward's decision."

We emphasize that it is not always in the best interest to require submission to treatment.

"Nor do statistical factors indicating that a majority of competent persons similarly situated choose treatment resolve the issue. The significant decisions of life are more complex than statistical determinations. Individual choice is determined not by the vote of the majority but by the complexities of the singular situation viewed from the unique perspective[s] of the person[s] called on to make the decision." *Superintendent of Belchertown State School v. Saikewicz,* supra, 370 N.E.2d at 428.

In a case such as this, where there is no evidence of what the patient's wishes might be with regard to withdrawal of medical treatment, we begin with the presumption that she would want to live. It is possible, however, to overcome this presumption when, upon consideration of all of the factors, it would be in the ward's "best interests" to withdraw or withhold medical treatment.

The guardian argues that "substituted judgment" is also the appropriate standard to use in cases involving persons who have never been competent. We disagree. In those cases, there is no evidence from which a guardian may substitute his judgment for what he believes the ward would have done under the circumstances and he can only use the best interests standard. The President's Commission For The Study Of Ethical Problems In Medicine And Biomedical And Behavioral Research stated, and we agree, that:

"The substituted judgment standard requires that a surrogate attempt to reach the decision that the incapacitated person would make if he or she were able to choose. * * * The substituted judgment standard can be used only if a patient was once capable of developing views relevant to the matter at hand; further, there must be reliable evidence of those views." President's Commission, supra, at 132–133.

Affirmed as modified.

HATHAWAY, C.J. and
FERNANDEZ, J., concur.