# In re Fiori

*John N. Schaeffer III,* for guardian.
*Sue Ann Unger, deputy attorney general,* for the Commonwealth.

SOKOLOVE, *J.,* February 3, 1993—Daniel Joseph Fiori has been comatose for more than 17 years. He suffered brain injuries in an accident in June of 1971, and was comatose until 1972. After that he was confined to a wheel chair and was able to communicate verbally only by making certain sounds. In 1976, he suffered a second brain injury resulting in him becoming totally comatose again. Since that time, he has been in a vegetative state with no hope of improvement. He has no quality of life. He cannot move, speak or communicate. He cannot eat. He does not feel pain and has no sensory awareness. He has no cognitive or higher brain function of any kind.

The facts relating to Daniel Fiori's present condition were presented without contradiction by a treating neurologist, Dr. William Stover Wiggins, and a neurologist,

Dr. David G. Cook, appointed by the court to submit an evaluation.

This matter came before us on the petition of Daniel Fiori's mother, who was appointed the guardian of his person by decree of this court dated January 7, 1980, by which he was adjudged incompetent. The petitioner, his mother and guardian, sought to have us authorize the removal of an abdominal feeding tube and to discontinue all other medications and life-sustaining procedures based on her allegations that her son has had no meaningful existence, that the continuation of life support procedures serves no purpose, and that the withdrawal of these life-sustaining medical treatments would be consistent with her son's wishes and desires at this time. We entered a decree on October 23, 1992, authorizing the discontinuance of life-sustaining procedures as requested and authorizing the Mayo Nursing & Convalescent Center to discontinue the use of the abdominal feeding tube and other medical procedures. By our order dated November 6, 1992, the original order was modified as a decree nisi to which the Commonwealth, represented by the attorney general's office, has filed exceptions.

Two procedural issues are raised by the attorney general's post-trial motions. These raise the question of the failure of the petitioner to notify the district attorney and the failure of the court to appoint a guardian ad litem. Neither of these issues was raised at the time of our hearing, and we deem, therefore, that they are waived. However, most significantly, we believe that the interests of the incompetent and of the Commonwealth are well-represented by the attorney general. Therefore, it is clear that there was no lack of representation of those interests which might oppose the position of the petitioner. As will be noted below, the contrary arguments are well-presented by the Commonwealth's attorney.

The real substantive issues in this matter involve us in serious and far-reaching considerations which go beyond the significance of this case alone. We have no precedent cases or guiding principles within the body of law of this Commonwealth regarding the specific issue involved in this case. When Mr. Fiori was involved in the first accident, he was 21 years of age. It is, therefore, not surprising that prior to his inability to communicate he expressed no intent or gave no directive about life-sustaining medical treatment. Since 1971, he has been in no condition to give any such direction.

Accordingly, the issue before us is whether we can rely upon and accept his mother/guardian's request that we permit termination of these procedures as being consistent with what her son's wishes *would have been* and in his best interests.

There are no reported Pennsylvania appellate cases involving the termination of life support of an incompetent who has not expressed his or her wishes in that regard while competent.[*] Petitioner would have us follow the decisions of other jurisdictions, which though recognizing the state's interest in preserving human life, allow the termination of life-sustaining treatment when the circumstances do not violate the bases on which the state's interest lie.

The nature of these interests has been enunciated in the Lackawanna County case of *Ragona v. Preate, supra,* as consisting of: (1) the state's interest in preservation of life; (2) prevention of suicide; (3) protection of innocent

---

* In *Ragona, Incompetent v. Attorney General Preate,* 6 D.&C.4th 202 (1990), the Common Pleas Court of Lackawanna County discussed at length cases from this Commonwealth and elsewhere where there was evidence of specific and general expressions of the wishes of the patients themselves.

third parties; and (4) preserving the integrity of the medical profession.

The criteria (2), (3), and (4) have no application to the case before us. There is no issue of suicide. The incompetent himself obviously is unaware of the present circumstances. There are no third parties involved, in that the incompetent has neither spouse nor children, and the only interested party is the petitioner herself. The representatives of the medical profession involved in this case both support the action authorized by our order.

The state's interest in the preservation of life is the most significant issue. Even a competent person's constitutional right to refuse medical treatment is, in our opinion, not to be too liberally construed. It is our concern that such a refusal not be tantamount to suicide. It is our concern that such a refusal not be motivated merely out of fear of surgery or other treatment. Such refusal cannot be authorized by parents on behalf of a minor child, where the life of a child is endangered. See *Green Appeal,* 448 Pa. 338, 292 A.2d 387 (1972); *Commonwealth v. Barnhart,* 345 Pa. Super. 10, 497 A.2d 616 (1985), *appeal denied,* 517 Pa. 620, 538 A.2d 874, *cert. denied, Barnhart v. Pennsylvania,* 488 U.S. 817.

With Judge Munley in *Ragona,* we agree "that the right to refuse treatment is not absolute and must be weighed against those competing governmental interests...." (citations omitted) And we agree that "[t]he Commonwealth's interest weakens and the individual's right grows as the prognosis dims and the intrusiveness of the treatment increases...." *Ragona, supra,* 11 Fid.Rep.2d at 10.

However, the state's mandate to preserve life requires an analysis of the quality of life to be preserved. What other lives are involved? What other consequences are involved in the life preservation process?

We believe that these inquiries have led other jurisdictions to permit the questions to be addressed and life/death decisions to be made by surrogates acting on behalf of and in the best interest of the terminally ill patient. The judgment of the surrogate should then be overseen by the court, and measured against an objective standard as to whether the decision conflicts in that particular case with the state's protected interests.

This latter proposal is a middle course between the unfettered discretion in the surrogate (conservator) allowed in California and the absolute denial proposed by the attorney general in the matter before us.

The California Court of Appeals decision in *Conservatorship of Drabick,* 200 Cal.App.3d 185, 245 Cal. Rptr. 840 (1988), held that court approval was *not* required for termination of life support of an incompetent in a vegetative state with no hope of recovery. The decision permits the surrogate full discretion, subject only to the determination that he acted on medical advice and in good faith.

In the Connecticut case of *Foody v. Manchester Memorial Hospital,* 40 Conn. Supp. 127, 482 A.2d 713 (1984), the semi-comatose patient Sandra Foody "[a]t no time expressed an opinion on the use of extraordinary life-support systems on patients with no reasonable hope of recovery." *Id.,* 482 A.2d at 717.

In permitting the termination of life support procedures, the Connecticut court applied a standard that is best expressed in the opinion at 482 A.2d at 720-21, as follows:

"Having ascertained the existence of a right on the part of the semicomatose Sandra Foody to refuse further life-sustaining measures, the question is how that right may best be exercised. The *Quinlan* court noted that '[c]ourts in the exercise of their parens patriae respon-

sibility to protect those under disability have sometimes implemented medical decisions and authorized their carrying out under the doctrine of "substituted judgment." *Hart v. Brown,* 29 Conn. Supp. 368 [370, 289 A.2d 386 (1972)].' *In re Quinlan, supra,* 70 N.J. 41, 355 A.2d 647. The *Quinlan* court authorized 'the guardian and family of Karen [Quinlan] to render their best judgment, subject to [consultation with attending physicians and ethics committee] as to whether she would exercise [the right] in these circumstances.' *Id.* at 41, 355 A.2d at 647. The rationale for this authorization was that an overwhelming majority of society would "in similar circumstances, exercise such a choice in the same way for themselves or for those closest to them." *Id.* at 41-42, 355 A.2d at 664. The Massachusetts courts have adopted a similar standard. *Superintendent of Belchertown State School v. Saikewicz,* [373 Mass. 743, 370 N.E.2d 417].... The primary test in the substituted judgment standard is subjective, i.e., to determine with as much accuracy as possible the wants and needs of the incompetent individual, not necessarily what may conform to what the majority deem wise or prudent. *Superintendent of Belchertown State School v. Saikewicz, supra,* 373 Mass. at 750-51, 370 N.E.2d at 430. An expression of intent while competent is not essential, the opinion may be based upon knowledge of the individual gleaned from a family relationship. *Id.; Matter of Spring, supra,* 380 Mass. 640, 405 N.E.2d 115. The decision should be 'that which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person.' *Superintendent of Belchertown State School v. Saikewicz, supra,* 373 Mass. at 752-53, 370 N.E.2d at 431.

"The analyses of the *Saikewicz* and *Quinlan* courts have been criticized for basing their decisions on *what a majority would do in similar circumstances where there was in fact no evidence as to what the individual's choice would be. Matter of Fox, supra,* 102 Misc. 2d 209-10, 423 N.Y.S.2d 580. The *Fox* court believed that the result of both decisions was to permit a choice to be made for one person by another, not necessarily reflecting what the decision of the incompetent would have been. *Id.* On review, the Appellate Division of the New York Supreme Court adopted the substituted judgment where a patient has not made his view known while competent. *Matter of Eichner (Fox), supra,* 73 App.Div.2d 473, 426 N.Y.S.2d 517." (emphasis added and citation omitted)

The Connecticut court, therefore, used an objective standard derived from a report issued by the President's Commission for the Study of Ethical Problems in Medicine and Biomedical Behavioral Research. The opinion stated:

"If the exercise of the right is to be maintained where no expression has been made by an incompetent patient as to treatment, it must take place within the context of an analysis which seeks to implement what is in that person's best interests by reference to objective societally shared criteria.... See Commission Report, pp. 134-35, ['deciding to Forego Life-Sustaining Treatment, Ethical, Medical, and Legal Issues in Treatment Decisions'] '[I]n assessing whether a procedure or course of treatment would be in a patient's best interests, the decision maker must take into account such factors as the relief of suffering, the preservation or restoration of functioning, and the quality as well as extent of life sustained.'" Commission Report, p. 135. *Foody v. Manchester Memorial Hospital, supra,* 482 A.2d at 721.

The decision to terminate life support in this matter is clearly within the standards expressed in *Ragona* and

in the President's Commission Report. This is no suicide issue. There are no third persons involved, except the patient's mother, who has spent years of her life attempting to ease his pain. The prognosis that his condition is irreversible is self-evident from the almost 20 years of coma. The medical evidence is convincing that Daniel Joseph Fiori's life is without content, let alone any quality.

For these reasons, we reaffirm our order as follows:

## FINAL DECREE

And now, February 3, 1993, after review of the memoranda of law, it is hereby ordered and decreed that the exceptions of the attorney general to our decree nisi of October 23, 1992, are denied and dismissed. The petition of Rosemarie Sherman, guardian of the person of Daniel Joseph Fiori, as incompetent, is granted. Mayo Nursing & Convalescent Center Inc. is hereby authorized to discontinue the use of the abdominal feeding tube which provides nutrition and hydration to said incompetent and to discontinue all medications and any other life-sustaining procedures to said incompetent.